**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MERCK & CO., INC., *et al.*,

      Plaintiffs,

      v.

MERCK KGAA,

      Defendant.

Civil Action No.: 16-0266 (ES) (MAH)

OPINION

SALAS, DISTRICT JUDGE

This is a dispute between two pharmaceutical companies that share a common predecessor but have since become separate and distinct: Plaintiffs Merck & Co., Inc., and its wholly owned subsidiary Merck Sharp & Dohme Corp., both New Jersey corporations (together, "Merck U.S."), and Defendant Merck KGaA, a German corporation ("Merck Germany"). Before the Court is Merck Germany's motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 (D.E. No. 186), on Merck U.S.'s claims for (i) common law breach of contract (Count Ten), (ii) false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count Eight), (iii) deceptive trade practices under New Jersey law, N.J.S.A. § 56:8-2 ("NJCFA") (Count Nine), and (iv) trademark dilution under both the Lanham Act, 15 U.S.C. § 1125(c) (Count Three), and New Jersey law, N.J.S.A. § 56:3-13.20 (Count Five), (D.E. No. 1 ("Complaint" or "Compl.")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, the motion is **GRANTED-in-part** and **DENIED-in-part**.

## I.    BACKGROUND[1]

Both Merck U.S. and Merck Germany manufacture and sell pharmaceutical products. (Compl. ¶¶ 2–4).  Merck Germany was founded in Germany in 1668.  (*Id.* ¶ 10).  In either 1890 or 1891, Merck Germany established its first U.S. affiliate, Merck & Co.  (Def. SMF ¶ 19 & Pl. Resp. SMF ¶ 19).  In 1917, Merck & Co. was the subject of expropriation by the United States government as a result of World War I.  (Def. SMF ¶ 20 & Pl. Resp. SMF ¶ 20).  At some point around the end of World War I in 1918, Merck Germany ceased distribution and sale of its products in the United States.  (D.E. No. 189-20, Ex. 18 to D.E. 189 ("Mundel Decl.") at 2; *see also* Def. SMF ¶ 21 & Pl. Resp. SMF ¶ 21).[2]  In 1919, Merck & Co. was established as an independent entity in the United States—separate from Merck Germany—which is Merck & Co., Inc.'s predecessor.  (Def. SMF ¶ 20 & Pl. Resp. SMF ¶ 20).  As a result, Merck U.S. considers itself a competitor of Merck Germany.  (*See* Compl. ¶ 18).

In 1955, the parties entered into a coexistence agreement ("1955 Agreement"), under which Merck Germany, then named "Emanuel Merck offene Handelsgesellschaft," agreed to use a geographical identifier as part of its "firm-name or corporate name."  (D.E. No. 188-1, Ex. A to D.E. No. 188 ("Bannigan Decl.") ¶ 2).  Specifically, Paragraph 2(a) of the 1955 Agreement provided that Merck U.S.

> will not object to the use in the United States and Canada by [Merck Germany] of "Emanuel Merck offene Handelsgesellschaft" . . . as all or part of a firm-name or corporate name provided such names are geographically identified with Germany as follows: **"*Emanuel Merck offene Handelsgesellschaft, Darmstadt, Germany*"** . . . all words being given equal prominence.

(*Id.* (emphasis added); *see also* Def. SMF ¶ 2 & Pl. Resp. SMF ¶ 2).  Under Paragraph 2(b) of

---

[1]    The Court gathers the following facts primarily from Merck Germany's statement of undisputed facts and Merck U.S.'s responses to the same.  (D.E. No. 187-1 ("Def. SMF"); D.E. No. 189-1 ("Pl. Resp. SMF")).

[2]    Unless otherwise noted, pin cites to Docket Entry numbers 188-4, 188-5 and 189-3 through 189-27 refer to those automatically generated by the Court's electronic filing system.

the 1955 Agreement, Merck Germany recognized Merck U.S.'s exclusive rights to the trademark "Merck" in the United States:

> [Merck Germany] recognizes the exclusive right of [Merck U.S.] to the use of the trademark Merck in the United States and Canada and in such countries will not use or attempt to acquire rights in any trademark containing Merck.

(D.E. No. 188-1, Ex. A to Bannigan Decl. ¶ 2(b)).  Indeed, Merck Germany does not dispute that Merck U.S. owns a federal trademark registration for the "Merck" mark.  (*See* Compl. ¶ 29; *see generally* Def. SMF & Pl. Resp. SMF).

In 1970, Merck Germany changed its name to "E. Merck," and the parties entered into an agreement to reflect Merck Germany's name change in the use of its "firm-name or corporate name" (the "1970 Agreement").  (D.E. No. 188-2, Ex. B to Bannigan Decl. ¶ 2(a); *see also* Def. SMF ¶ 3 & Pl. Resp. SMF ¶ 3).  In essence, under Paragraph 2(a) of the 1970 Agreement, Merck Germany was still required to use a geographic identifier in its "corporate name," only now using the new name "E. Merck":

> [Merck U.S.] will not object to the use of the name E. Merck in the United States and Canada by [Merck Germany] as all or part of a firm-name or corporate name provided such names are geographically identified with Germany as follows: "***E. Merck, Darmstadt, Germany***" all words being given equal prominence.

(D.E. No. 188-2, Ex. B to Bannigan Decl. ¶ 2(a) (emphasis added)).  Paragraph 2(b), pursuant to which Merck U.S. retained exclusive rights to the trademark "Merck" in the United States, remained unchanged.  (*See id.* ¶ 2(b)).  Approximately one year later, in 1971, Merck Germany "formally reemerged in the U.S. market."  (D.E. 189-20, Ex. 18 to Mundel Decl. at 2; *see also* Def. SMF ¶ 22 & Pl. Resp. SMF ¶ 22).

3

In 1995, Merck Germany again changed its name, this time to "Merck KGaA."[3]  (Def. SMF ¶ 7 & Pl. Resp. SMF ¶ 7).  Merck U.S. initially objected to this name change in a series of communications.  Specifically, on August 29, 1995, Merck U.S. informed Merck Germany of its position that *any* use of "Merck KGaA" in the United States would violate the 1970 Agreement.  (D.E. No. 188-4, Ex. D to Bannigan Decl. at 2).  On August 31, 1995, Merck Germany informed Merck U.S. of its contrasting position that its use of "Merck KGaA, Darmstadt, Germany" in the United States was in accordance with the 1970 Agreement.  (D.E. No. 188-5, Ex. E to Bannigan Decl. at 2).

On December 15, 1995, Merck U.S.'s counsel wrote to Merck Germany to object to Merck Germany's use of "Merck" (i) on a product catalogue, available in the United States, and (ii) throughout its website, accessible in the United States.  (D.E. No. 188-9, Ex. I to Bannigan Decl. at 2–7).  The product catalogue included the mark "Merck" on the front cover and spine, contained the heading "The Merck Catalogue for Windows" on the inside cover, and listed features such as "[a]n electronic reference book for some 11,000 products."  (*Id.* at 4–6).  The bottom of the first page included the name "Merck KGaA, Darmstadt, Germany."  (*Id.* at 7).  The website, which featured Merck Germany's products and services, contained both the mark "Merck" at the top of each page and a page entitled "Merck KGaA at a glance."  (*Id.* at 8–10).

In March 1996, the parties met and discussed Merck U.S.'s objections as described above.  (D.E. No. 188-14, Ex. N to Bannigan Decl. ("Matukaitis Dep.") at 66:17–22).  During the meeting, Merck Germany assured Merck U.S.'s then Co-Head of Intellectual Property, Paul Matukaitis, that Merck Germany intended to use "Merck KGaA, Darmstadt, Germany . . . only as a company name [or] firm name . . . strictly . . . referencing back to the parent company in

---

[3]     "KGaA" stands for the German business entity designation "Kommanditgesellschaft Auf Aktien," meaning "limited partnership on shares."  (Compl. ¶ 37).

Germany," rather than as "a trademark, trade name, branding or any other use." (*Id.* at 64:11–66:5 & 66:17–68:10).

Following the meeting, the parties continued to disagree on Merck Germany's use of "Merck KGaA, Darmstadt, Germany" in the United States—including use as a "corporate name"—in a series of communications dated July 1996 to February 1997. (D.E. No. 188-8, Ex. H to Bannigan Decl. at 2; D.E. No. 188-7, Ex. G to Bannigan Decl. at 1 & 3; D.E. No. 188-6, Ex. F to Bannigan Decl. at 1–2 & 6). Nonetheless, Merck U.S. "decided not to sue" Merck Germany in the United States at that time, and instead "monitor[ed] [Merck Germany's] use" of the name. (Matukaitis Dep. at 66:5–14; *see also* Pl. Resp. SMF ¶ 9). As related to the instant matter, Merck U.S. representatives testified that, as far as Merck U.S. was aware, Merck Germany's use of "Merck KGaA, Darmstadt, Germany" was limited to "copyright statement[s] . . . [and] disclaimer[s]" as opposed to "trademark, branding, trade name" or any other use. (D.E. No. 189-16, Ex. 14 to Mundel Decl. at 195:15–197:15; D.E. No. 189-15, Ex. 13 to Mundel Decl. ("Supplement to Matukaitis Dep.") at 89:21–25)). Specifically, Matukaitis testified that Merck U.S. "let" Merck Germany "use Merck KGaA, Darmstadt, Germany in place of E. Merck, Darmstadt, Germany[,] but only to the extent as provided in [the 1970 Agreement]," that is, "[o]nly as a firm[-]name or corporate name." (Matukaitis Dep. 68:12–25).

In 2002, Merck U.S. became aware that a group of investigators working on a study conducted by Merck Germany were unsure of whether the study was being conducted by Merck U.S. or Merck Germany. (D.E. No. 188-16, Ex. P. to Bannigan Decl. at 2; *see also* Def. SMF ¶ 15 & Pl. Resp. SMF ¶ 15). By email dated February 26, 2002, Merck U.S. requested that Merck Germany send notice to "all investigators contacted in the U.S. clarifying that this is a *Merck KGaA, Darmstadt, Germany* study and there is no association with [Merck U.S.]." (D.E. No.

188-16, Ex. P. to Bannigan Decl. at 2 (emphasis added); *see also* Def. SMF ¶ 15 & Pl. Resp. SMF ¶ 15). In a separate email dated August 17, 2002, Merck U.S. informed Merck Germany that it had "no objection to your explaining the distinction between [Merck U.S.] and Merck KGaA so long as it is done within the terms of [the 1970] Agreement on use of the name and trademark MERCK." (D.E. No. 188-17, Ex. Q to Bannigan Decl. at 1; *see also* Def. SMF ¶ 18 & Pl. Resp. SMF ¶ 18). In the same email, Merck U.S. explained its position that Merck Germany's "use of MERCK in the U.S. is limited to use as all or part of a firm-name or corporate name geographically identified with Germany as specified in the [1970] Agreement." (D.E. No. 188-17, Ex. Q to Bannigan Decl. at 1).

In 2014, Merck Germany began planning an advertising campaign that, according to Merck Germany, "celebrat[ed] its 125th anniversary milestone in the U.S." (the "125 Years Campaign"). (Def. SMF ¶ 23 & Pl. Resp. SMF ¶ 23). Merck Germany's Head of Corporate Branding and Strategic Communication Projects, Axel Loeber, wrote in an internal email dated April 22, 2014, that Merck Germany "should use the anniversary as [a] key opportunity to leverage the EMD[4] brand—and to connect it to Merck. (After all, Merck U.S. was founded 125 years ago, not EMD)." (D.E. No. 189-3, Ex. 1 to Mundel Decl. at 2; *see also* Pl. Resp. SMF ¶ 23).

Merck Germany's internal documents show that it evaluated the potential legal consequences of its use of "Merck KGaA, Darmstadt, Germany." Specifically, in a February 15, 2015 internal document, Merck Germany's Senior Vice President of Group Communications, Walter Huber, assessed the potential use of "Merck KGaA, Darmstadt, Germany" in connection with the 125 Years Campaign. (D.E. No. 189-17, Ex. 15 to Mundel Decl. at 2). The document

---

[4]    Merck Germany conducts business under three brands that incorporate "EMD": EMD Serono; MilliporeSigma, formerly known as EMD Millipore; and EMD Electronics, formerly known as EMD Performance Materials. (Mov. Br. at 5).

indicated that "[a]ccording to our name contract[,] only 'E. Merck' is allowed." (*Id.* at 3). The document further noted that the proposed use of "Merck KGaA, Darmstadt, Germany" in the 125 Years Campaign "is a grey area and bears a <u>litigation risk</u>" of "breaching the name contract by using 'Merck' in the U.S." and "taking advantage of their history and their good name in the U.S." (*Id.* (emphasis in original)). The document also indicated that one of the goals of the 125 Years Campaign was to "[p]rovoke [Merck U.S.] in order to make them come to the table." (*Id.*). In addition, a separate February 23, 2015 email from Merck Germany's trademark counsel Jonas Kölle indicated that use of "Merck KGaA, Darmstadt, Germany" as "a logo is a non-compliant use since according to the [1970 Agreement,] we are only allowed to use the company name and . . . we should avoid any semblance of a brand use." (D.E. No. 189-18, Ex. 16 to Mundel Decl. at 9). Finally, a June 15, 2015 internal email exchange indicated Merck Germany's willingness to "go to Logo jail" for its decision to use the "Merck Logo." (D.E. No. 189-12, Ex. 10 to Mundel Decl. at 2).

Starting in June 2015 and continuing for approximately one year, Merck Germany ran advertisements for the 125 Years Campaign in *The New York Times*, *The Wall Street Journal*, *The Boston Globe*, and *The Washington Post*. (Def. SMF ¶¶ 23–24 & Pl. Resp. SMF ¶¶ 23–24; *see also* D.E. No. 187-3 ("Connolly Decl.") ¶ 5). The advertisements featured variations of the following statements: "125 Years in the U.S.," "125 Years Smarter, Together," "125 Years in the U.S. Smarter, Together," and "asking [questions] relentlessly for 125 years here in the U.S." (Def. SMF ¶ 25 & Pl. Resp. SMF ¶ 25). The advertisements included the name "Merck KGaA, Darmstadt, Germany" toward the bottom left corner. (D.E. No. 187-4, Ex. A to Connolly Decl.). In addition, the advertisements referenced Merck Germany's "science and technology breakthroughs" and included a link to the 125 Years Campaign website,

"125yearssmartertogether.com."  (*Id.*).  For example, depicted below is a representation of the advertisements circulated as part of the 125 Years Campaign.  (*See* Connolly Decl. ¶ 5).



(D.E. No. 187-4, Ex. A to Connolly Decl.).

The 125 Years Campaign website featured articles referencing specific pharmaceutical products from Merck Germany.  (D.E. Nos. 189-23 to 189-26, Exs. 21–24 to Mundel Decl.).

The 125 Years Campaign website also referenced the online retail of Merck Germany's pharmaceutical products.  (D.E. No. 189-26, Ex. 24 to Mundel Decl. at 2).

On January 15, 2016, Merck U.S. filed the instant action alleging, *inter alia*, breach of contract, false advertising, trademark dilution, trademark infringement, and unfair competition.  (Compl. ¶¶ 86–159).[5]  Merck U.S. bases its claims, in relevant part, on Merck Germany's alleged use of "Merck" as a "trade name in the United States" and "as a cornerstone of its U.S. branding."  (*Id.* ¶¶ 37–39 & 41–85).  The parties engaged in extensive discovery before Merck Germany filed the instant motion for partial summary judgment.  (D.E. No. 186; D.E. No. 187 ("Mov. Br.")).  The motion is fully briefed.  (D.E. No. 189 ("Opp."); D.E. No. 192 ("Reply")).

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when—in viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant—a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor.  *Id.*  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  *Id.* at 249.  The movant bears the burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the

---

[5]    Merck Germany does *not* move for summary judgment on Merck U.S.'s claims for trademark infringement or unfair competition.  (*See generally* Mov. Br.).

nonmoving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. To meet its burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

## III.   DISCUSSION

### A.   Breach of Contract (Count Ten)

Merck Germany moves for summary judgment on Merck U.S.'s common law claim for breach of the 1970 Agreement. (Mov. Br. at 6–18). Merck Germany specifically sets forth four defenses to Merck U.S.'s breach of contract claim: (i) contract modification; (ii) equitable estoppel; (iii) waiver; and (iv) laches. (*Id.* at 10–18). Broadly, Merck U.S. argues that there are genuine disputes of material fact as to the parties' conduct which the Court must examine in resolving the motion. For the following reasons, the Court agrees with Merck U.S.

As a preliminary matter, the parties effectively concede that under New Jersey choice of law principles, New Jersey law applies to Merck U.S.'s contract claim. (*See id.* at 10–11 & Opp. at 12 n.5). To establish breach of contract under New Jersey law, a plaintiff must show the following: (i) the existence of a valid contract between the parties; (ii) plaintiff's performance due under that contract; (iii) defective or deficient performance under the contract by the defendant; and (iv) damages resulting from the defendant's breach. *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021).

#### i.   Contract Modification

"Under New Jersey law, parties to an existing contract, by mutual assent, may modify their contract, and 'modification can be proved by an explicit agreement to modify, or . . . by the actions and conduct of the parties, so long as the intention to modify is *mutual and clear*."

*Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 322 (3d Cir. 2006) (emphasis added) (quoting *County of Morris v. Fauver*, 707 A.2d 958, 967 (N.J. 1998)).  Importantly, "[w]hether the parties acted in a manner sufficient to create implied contractual terms is a question of fact generally precluding summary judgment."  *Troy v. Rutgers*, 774 A.2d 476, 483 (N.J. 2001).  An ambiguous course of dealing, where "'one party might reasonably infer that the original contract was still in force, and the other that it had been changed,' will not support a modification."  *Fauver*, 707 A.2d at 967 (quoting 17A *C.J.S. Contracts* § 375 (1963)).  "Unilateral statements or actions made after an agreement has been reached or added to a completed agreement clearly do not serve to modify the original terms of a contract . . . because knowledge and assent are essential to an effective modification."  *Id.*  In addition, modification must be based on new or additional consideration.  *Id.*

Merck Germany argues that the parties modified the 1970 Agreement to permit its use of "Merck KGaA, Darmstadt, Germany" as its "corporate name."  (Mov. Br. at 12; *see also* Reply at 2–4).  However, the record contains genuine issues of material fact as to the parties' mutual intent.  To start, the parties entered into the 1970 Agreement to reflect Merck Germany's name change to "E. Merck" but did not do so to reflect Merck Germany's subsequent name change to "Merck KGaA" in 1995.  (*See* D.E. No. 188-2, Ex. B to Bannigan Decl. ¶ 2(a)).  Further, following Merck Germany's name change to "Merck KGaA" in 1995, the record contains a series of letters, dated August 1995 to February 1997, in which Merck U.S. objected to Merck Germany's use of "Merck KGaA, Darmstadt, Germany" in the United States, including use as a "corporate name."  (D.E. Nos. 188-4, 188-6, 188-8 & 188-9, Exs. D, F, H & I to Bannigan Decl.).  Indeed, Merck U.S.'s July 26, 1996 letter stated its position that "permitting the change of 'E. Merck' to 'Merck KGaA'" would require a new agreement, which it was not interested in

pursuing at that time.  (D.E. No. 188-8, Ex. H to Bannigan Decl. at 2).  Finally, Merck Germany's own internal documents from 2015 assessing legal risk in connection with the 125 Years Campaign indicated its understanding that "[a]ccording to our name contract[,] only 'E. Merck' is allowed."  (D.E. No. 189-17, Ex. 15 to Mundel Decl. at 3).  Therefore, a jury could reasonably conclude from this evidence that the parties did not form a clear and mutual intent to modify the 1970 Agreement to allow for Merck Germany's use of "Merck KGaA, Darmstadt, Germany."

Even assuming mutual intent to modify the 1970 Agreement, genuine issues of material fact exist as to what *extent*, if any, the parties intended to modify Paragraph 2(b) of the 1970 Agreement as related to Merck Germany's use of "Merck KGaA, Darmstadt, Germany" as a trademark or trade name in its U.S. branding.  Merck Germany's contention that the parties mutually intended to modify Paragraph 2(a) of the 1970 Agreement to permit its use of "Merck KGaA, Darmstadt, Germany" as a "corporate name," appears to miss the mark by redefining Merck U.S.'s breach of contract claim.  Indeed, Merck U.S.'s breach of contract claim is premised on Merck Germany's alleged use of "Merck KGaA, Darmstadt, Germany" as a trademark or trade name in its U.S. branding, particularly in its 125 Years Campaign, in violation of Paragraph 2(b) of the 1970 Agreement.  (*See* Compl. ¶¶ 37–39, 41–85, 153–55; *see also* Opp. at 1 & 6).  In other words, notwithstanding whether Merck U.S. may have passively accepted Merck Germany's use of "Merck KGaA, Darmstadt, Germany" in certain legal documents, Merck U.S.'s Complaint is concerned with Merck Germany's alleged use of "Merck KGaA, Darmstadt, Germany" in its U.S. branding.  For example, Merck U.S. asserts that its decision not to sue Merck Germany in the 1990's was based on Merck Germany's assurances that its use of "Merck KGaA, Darmstadt, Germany" would be limited to legal disclaimers and copyright

statements, as opposed to "trademark, branding, trade name" or any other use.  (*See* Opp. at 14–15 (quoting Supplement to Matukaitis Dep. at 89:21–25)).  Moreover, the parties acknowledge that they dispute the types of use that are permissible as a "firm-name or corporate name" under Paragraph 2(a) of the 1970 Agreement and whether Merck Germany's marketing or branding falls outside of Paragraph 2(a)'s scope.  (*See* Mov. Br. at 15 & Opp. at 11).  Thus, even if the parties intended to modify Paragraph 2(a) to allow for Merck Germany's use of "Merck KGaA, Darmstadt, Germany" as a "corporate name," the bounds of such use remain unclear and disputed, particularly in light of Paragraph 2(b) and Merck U.S.'s trademark-based claims.  These factual issues preclude summary judgment as to a clear and mutual intent to modify the 1970 Agreement.

Merck Germany argues that Merck U.S.'s decision to forego legal action until the present suit reflects "the type of silence or inaction sufficient to establish a mutual intent," relying on *Khafagy v. Jersey Girls Gentlemen's Club*, No. 10-2422, 2014 WL 6883417, at *3 (D.N.J. Dec. 4, 2014).  (Mov. Br. at 13).  The Court disagrees.  To start, as previously discussed, genuine issues of material fact as to the scope of "corporate name" use preclude a finding as to whether and to what extent the parties might have agreed to modify the 1970 Agreement.  Further, "[s]ilence does not ordinarily manifest assent, but the relationships between the parties or other circumstances may justify the offeror's expecting a reply and, therefore, assuming that silence indicates assent to the proposal."  *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284–85 (N.J. 1992) ("where an offeree gives *no indication that he or she objects* to any of the offer's essential terms, and passively accepts the benefits of an offeror's performance, the offeree has impliedly manifested his or her unconditional assent to the terms of the offer" (emphasis added)).  Here, rather than remain silent, the record shows that Merck U.S. stated its objections to Merck

Germany's proposed use of "Merck KGaA, Darmstadt, Germany."  And, importantly, Merck Germany's internal emails reflect an understanding that use of "Merck KGaA, Darmstadt, Germany" in its U.S. branding would create a litigation risk.  (D.E. Nos. 189-12, 189-17 & 189-18, Exs. 10, 15 & 16 to Mundel Decl.).  Therefore, a reasonable jury could find that Merck U.S. did *not* remain silent, nor is Merck Germany justified in assuming that Merck U.S.'s conduct manifested unconditional assent to its proposed modification.  *See id.*

The case on which Merck Germany relies, *Khafagy*, 2014 WL 6883417, at *3, does not lead to a contrary conclusion.  (*See* Mov. Br. at 13).  There, the District Court considered an application to enforce late fees pursuant to a settlement agreement.  *Khafagy*, 2014 WL 6883417, at *3.  The District Court granted the application in part after finding that the parties modified the settlement agreement because the plaintiffs remained silent after the defendants sent the plaintiffs a letter proposing a modified payment schedule, and then accepted the payments according to the modified schedule.  *Id.*  Unlike the plaintiffs in *Khafagy*, Merck U.S.'s initial broad objections to the use of "Merck KGaA, Darmstadt, Germany," coupled with its eventual acceptance of the use of "Merck KGaA, Darmstadt, Germany" "[o]nly as a firm[-]name or corporate name," create a genuine issue of material fact as to whether and to what extent the parties intended to modify the 1970 Agreement.  (*See* Matukaitis Dep. 68:12–23).

Merck Germany further relies on Merck U.S.'s February 2002 email requesting that Merck Germany refer to itself as "Merck KGaA, Darmstadt, Germany" in reference to a Merck Germany study, and Merck U.S.'s August 2002 email stating that it had "no objection" to Merck Germany explaining the distinction between them "so long as it is done within the terms of [the 1970 Agreement] on use of the name and trademark MERCK," whereby "use of MERCK in the U.S. is limited to use as all or part of a firm-name or corporate name geographically identified

with Germany." (D.E. No. 188-16, Ex. P. to Bannigan Decl. at 2 & D.E. No. 188-17, Ex. Q to Bannigan Decl. at 1; *see also* Mov. Br. at 13–14). As discussed above, the parties' intent to modify is bound up in the factual issue of "corporate name" use, the scope of which the parties dispute. Therefore, this evidence indicates that the parties' course of dealing is, at best, ambiguous as to whether and to what extent the parties intended to modify the 1970 Agreement.

Therefore, genuine issues of material fact as to clear and mutual intent preclude summary judgment on Merck Germany's defense of contract modification.[6]

### ii. Equitable Estoppel

"The essential elements of equitable estoppel are a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment." *O'Malley v. Dep't of Energy*, 537 A.2d 647, 651 (N.J. 1987) (collecting cases); *see also Knorr v. Smeal*, 836 A.2d 794, 799 (N.J. 2003). Equitable estoppel is an equitable doctrine subject to the discretion of the trial court. *See Bechtel v. Robinson*, 886 F.2d 644, 647 (3d Cir. 1989). As the doctrine is based on "fundamental fairness," it requires the Court to determine where the equities lie. *See Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, No. 07-0321, 2008 WL 2783339, at *4 (D.N.J. July 16, 2008). It is "designed to assure that the loss is borne by the party who made an injury possible or could have prevented it." *In re Hunt's Pier Assocs.*, 143 B.R. 36, 44 (Bankr. E.D. Pa. 1992) (citing *Miller v. Miller*, 478 A.2d 351, 355 (N.J. 1984)).

---

[6] As such, the Court does not reach Merck Germany's argument regarding consideration. (*See* Mov. Br. at 14).

In addition, Merck Germany summarily asks the Court to dismiss Counts One, Two, Four, Six, and Seven "to the extent they are premised on the allegation that [Merck Germany] may not use [Merck KGaA, Darmstadt, Germany] as a corporate name in the U.S." (*Id.* at 15). Because the Court denies Merck Germany's motion as to Count Ten, the Court also denies the motion to the extent that it seeks dismissal of Counts One, Two, Four, Six, and Seven.

Merck Germany again relies on Merck U.S.'s 2002 communications to establish the elements of equitable estoppel—specifically, Merck U.S.'s February 2002 email requesting that Merck Germany refer to itself as "Merck KGaA, Darmstadt, Germany" in reference to a Merck Germany study, and Merck U.S.'s August 2002 email stating that Merck Germany's "use of MERCK in the U.S. is limited to use as all or part of a firm-name or corporate name geographically identified with Germany."  (D.E. No. 188-16, Ex. P. to Bannigan Decl. at 2 & D.E. No. 188-17, Ex. Q to Bannigan Decl. at 1; *see also* Mov. Br. at 16).  As discussed in Section III.A.i, *supra*, the record presents a genuine dispute with respect to the parties' intent with respect to these communications, and particularly whether they induced reliance to Merck Germany's detriment.  Indeed, as noted above, Merck Germany's internal emails reflect an understanding that use of "Merck KGaA, Darmstadt, Germany" in its U.S. branding would create a litigation risk.  (D.E. Nos. 189-12, 189-17 & 189-18, Exs. 10, 15 & 16 to Mundel Decl.).  Thus, factual issues relevant to equitable estoppel are better resolved by a jury.  Therefore, genuine issues of material fact preclude summary judgment on Merck Germany's defense of equitable estoppel.

### iii.    Waiver

"Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately decided to relinquish them."  *Shebar v. Sanyo Bus. Sys. Corp.*, 544 A.2d 377, 384 (N.J. 1988).  The New Jersey Supreme Court has set forth an "admonition that waiver issues, which turn on intent, should not be decided on a summary judgment basis."  *Garden State Bldgs., L.P. v. First Fidelity Bank, N.A.*, 702 A.2d 1315, 1324 (N.J. App. Div. 1997) (citing *Shebar*, 544 A.2d at 384).

To show waiver, Merck Germany relies on Merck U.S.'s decision not to sue Merck Germany in the United States until the present action.  (Mov. Br. at 18).  For example, Merck Germany points to Matukaitis's testimony that Merck U.S. "let" Merck Germany "use Merck, KGaA, Darmstadt, Germany in place of E. Merck, Darmstadt, Germany[,] but only . . . as a firm[-]name or corporate name . . . not as an operating name and not as doing business in the U.S."  (Matukaitis Dep. 67:13–68:25; *see also* Mov. Br. at 18).  However, as discussed in Section III.A.i, *supra*, the record presents genuine issues of material fact as to whether and to what extent Merck U.S. may have intended to waive certain rights under the 1970 Agreement.  Indeed, the question of intent to waive is bound up in the scope of "corporate name" use, which the parties dispute.  Therefore, genuine issues of material fact preclude summary judgment on Merck Germany's defense of waiver.

### iv.    Laches

The doctrine of laches operates "to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party."  *Knorr*, 836 A.2d at 800.  "The core equitable concern in applying laches is whether a party has been harmed by the delay."  *Id.*  "[O]nly the rarest of circumstances and only overwhelming equitable concerns" would allow for the doctrine to "shorten an otherwise permissible period for initiation of litigation."  *Fox v. Millman*, 45 A.3d 332, 344 (N.J. 2012).  "Length of delay and other matters of historical circumstance are questions of fact."  *E.E.O.C. v. Great Atl. & Pac. Tea Co.*, 735 F.2d 69, 81 (3d Cir. 1984).

Merck Germany summarily argues that it was prejudiced by Merck U.S.'s decision to wait to bring the present action, filed approximately 21 years after Merck Germany changed its name to "Merck KGaA" in 1995, and thus Merck U.S. should be precluded from bringing any

claim "premised on corporate name use of [Merck KGaA, Darmstadt, Germany]" in the United States. (Mov. Br. at 17–18).[7] As previously discussed, the propriety of Merck Germany's use of "Merck KGaA, Darmstadt, Germany" as its "corporate name"—versus use in its U.S. branding—is bound up in factual disputes. Therefore, genuine issues of material fact preclude summary judgment on Merck Germany's defense of laches.

Accordingly, Merck Germany's motion for summary judgment with respect to Count Ten for common law breach of contract is **DENIED**.

### B. False Advertising[8]

Next, Merck Germany moves for summary judgment on Merck U.S.'s false advertising claims under federal and state law. Specifically, Merck Germany's arguments relate to its 125 Years Campaign that launched in the United States in 2015. The Court begins its discussion with the false advertising claim brought under the Lanham Act, followed by that brought under New Jersey law.

### i. Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count Eight)

To bring a claim for false advertising under the Lanham Act, the movant must show that the alleged false advertising was made "in connection with any goods or services," 15 U.S.C. § 1125(a)(1), and

> 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to

---

[7]     Merck U.S. asserts, and Merck Germany does not dispute, that Merck U.S.'s contract claim is timely under the applicable six-year statute of limitations pursuant to N.J.S.A. § 2A:14-1. (*See* Opp. at 21; *see generally* Mov. Br. at 17–18; *see also* Opp. at 15 ("Once [Merck Germany] began to use "Merck KGaA, Darmstadt, Germany" as its brand and logo in connection with the 2015 [125 Years Campaign], Merck [U.S.] promptly sued to stop these misuses.")).

[8]     The Court discusses Merck U.S.'s claim for false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and its claim for deceptive trade practices under the NJCFA's parallel provision, N.J.S.A. § 56:8-2, together.

> influence purchasing decisions; 4) that the advertised goods
> traveled in interstate commerce; and 5) that there is a likelihood of
> injury to the plaintiff in terms of declining sales, loss of good will,
> etc.

*Pernod Ricard USA, LLC v. Bacardi USA, Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (alteration in original); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co*., 290 F.3d 578, 586 (3d Cir. 2002). The statutory "in connection with" requirement is interpreted broadly, and it is satisfied when there is *any* connection to the sale of goods or services in the advertisement. *See Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 309 (D.N.J. 1998) (holding that even a non-commercial website satisfies this requirement); *see also People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 365–66 (4th Cir. 2001) (same); *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014) ("An advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service.").

Merck Germany raises the following arguments: (i) the advertisements that were part of the 125 Years Campaign were not "made in connection" with Merck Germany's goods or services; (ii) the statements made in the 125 Years Campaign were not literally false; (iii) the statements made in the 125 Years Campaign were not deceptive; and (iv) there is no evidence that the allegedly false statements made in the 125 Years Campaign were material to any purchasing decisions. (Mov. Br. at 19–27). In response, Merck U.S. generally argues that genuine issues of material fact as to each element of its false advertising claim under the Lanham Act preclude summary judgment. (Opp. at 22–29). For the following reasons, the Court agrees with Merck U.S.

First, Merck Germany argues that the advertisements that were part of the 125 Years Campaign did not promote its products or services; instead, it argues that the campaign

celebrated the 125th anniversary of its founding.  (Mov. Br. at 20–21).  In response, Merck U.S. argues that the 125 Years Campaign advertisements implicitly mentioned its products and directed consumers to the 125 Years Campaign website.  (Opp. at 28; *see also* D.E. No. 187-4, Ex. A to Connolly Decl.).  Further, Merck U.S. argues that the 125 Years Campaign website directly referenced Merck Germany products.  (Opp. at 27).

Merck U.S. sets forth sufficient facts that create a genuine dispute as to whether the advertisements that were part of the 125 Years Campaign included false statements made "in connection with" Merck Germany's goods or services.   The 125 Years Campaign advertisements, as depicted in Section I, *supra*, stated that Merck Germany's "science and technology breakthroughs . . . have changed lives" and included a link to the 125 Years Campaign website.  (D.E. No. 187-4, Ex. A to Connolly Decl.).  The website—explicitly designated as "125yearssmartertogether.com"—was launched as part of the 125 Years Campaign and featured articles that directly referenced Merck Germany's products.  For example, the 125 Years Campaign website featured an article entitled "Taking a Team to the Cutting Edge of Stem Cell Research" that described how a Merck Germany scientist's team "developed the Mobius® CellReady 3L Bioreactor, a product used for large-scale production of stem cells."  (D.E. No. 189-23, Ex. 21 to Mundel Decl. at 2).  The 125 Years Campaign website also referenced the online retail of Merck Germany products.  (D.E. No. 189-26, Ex. 24 to Mundel Decl. at 1). Specifically, an article entitled "Introducing MilliporeSigma" explained that Merck Germany had acquired another company to create a "web[-]based laboratory supply store similar to the consumer goods online retailer Amazon and a twenty four-hour delivery service," describing the service as a "laboratory supply powerhouse" and "one stop shop for researchers."  (*Id.*).  The article contained a direct link to "MilliporeSigma."  (*Id.*).  In addition, Merck Germany's internal

documents stated that the goal of the 125 Years Campaign was to promote "[c]ustomer awareness."  (D.E. No. 189-27, Ex. 25 to Mundel Decl. at 3).  Therefore, a reasonable jury could find that the "implicit but easily inferred" message of the 125 Years Campaign was the promotion of Merck Germany's products and services—namely, its "science and technology breakthroughs" throughout its 125-year history, and those products and services referenced on the 125 Years Campaign website.  *See Jordan*, 743 F.3d at 518.

Second, Merck Germany argues that the statements made in the 125 Years Campaign and published in major United States publications—specifically, "***125 years in the U.S***," "***125 Years in the U.S. Smarter, Together***," "***125 Years Smarter, Together***," and "***asking [questions] relentlessly for 125 years here in the U.S.***"—were not literally false.   (Mov. Br. at 18–19 & 21–22 (emphasis added)).

"Liability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers."  *Novartis Consumer Health*, 290 F.3d at 586.  In other words, "actual deception or a tendency to deceive is presumed if a plaintiff proves that an advertisement is unambiguous and literally false."  *Pernod Ricard USA*, 653 F.3d at 248 (explaining that if plaintiff can prove literal falsity, then plaintiff need not prove actual deception or a tendency to deceive); *see also Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993) ("a plaintiff must prove *either* literal falsity *or* consumer confusion, but not both").  "In analyzing whether an advertisement or product name is literally false, a court must determine, first, the unambiguous claims made by the advertisement or product name, and second, whether those claims are false."  *Novartis Consumer Health*, 290 F.3d at 586.  "A 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily

as if it had been explicitly stated.'" *Id.* at 586–87 (quoting *Clorox Co. v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 35 (1st Cir. 2000)).   The "common theme" in a facially false advertisement is "that the consumer will unavoidably receive a false message" from the advertisement. *Id.* at 587.

Merck Germany specifically argues that the statements at issue were true because Merck Germany "conducted business" in the United States "with brief gaps" since 1890, 125 years before the 125 Years Campaign launched in 2015. (Mov. Br. at 21–22).  Merck Germany further argues that the statement "125 Years in the U.S." is not literally false because it is ambiguous and subject to varying interpretations.  (*Id.* at 22).  Merck Germany offers three interpretations: "it has been 125 years since [Merck Germany] opened a United States office, contracted to establish a [United States] affiliate or, alternatively, that the company's history and presence in the [United States] began 125 years prior."  (*Id.*).  In response, Merck U.S. argues that Merck Germany's proposed interpretations convey the same "unambiguous, undeniably false message: operation in the United States for 125 years," and maintain that genuine issues of material fact as to literal falsity are in dispute.  (Opp. at 23–27).  For the following reasons, the Court agrees with Merck U.S.

Merck U.S. sets forth sufficient facts that create a genuine dispute as to whether the statements made in the 125 Years Campaign were literally false.  First, the parties dispute whether Merck Germany established its first U.S. affiliate, Merck U.S.'s predecessor Merck & Co., in 1890 or 1891.  (*See* Def. SMF ¶ 19 & Pl Resp. SMF ¶ 19).  Second, the record shows that Merck Germany ceased distribution and sale of its products in the United States at some point around 1918, Merck Germany and Merck U.S. have operated as separate entities since 1919, and Merck Germany "formally reemerged in the U.S. market" in 1971.  (D.E. No. 189-20, Ex. 18 to

Mundel Decl. at 2; *see also* Def. SMF ¶¶ 20–22 & Pl. Resp. SMF ¶¶ 20–22).  Third, Merck Germany's internal communications reflected an understanding that "Merck U.S. was founded 125 years ago, not EMD."  (D.E. No. 189-3, Ex. 1 to Mundel Decl. at 2).  Therefore, a reasonable jury could find that the statements at issue were both unambiguous and literally false because—whether Merck & Co. was founded in 1890 or 1891—the record contains evidence noting Merck Germany's *absence* from the United States for several years since the founding of its first U.S. affiliate.

Finally, Merck Germany argues that the statements in the 125 Years Campaign such as "125 Years in the U.S. Smarter, Together," and "asking [questions] relentlessly for 125 years here in the U.S." were not literally false because they amount to mere puffery.  (Mov. Br. at 22–23).  In response, Merck U.S. argues that a jury could find that the statements do not amount to puffery.  (Opp. at 25).  The Court agrees with Merck U.S.  "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language."  *Castrol Inc.*, 987 F.2d at 945; *see also Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) (explaining puffery includes "exaggerated statements of bluster or boast upon which no reasonable consumer would rely").  Such language is "considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer." *Castrol Inc.*, 987 F.2d at 945 (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts*, § 109, at 756–57 (5th ed. 1984)).  A predicate for a claim to amount to mere puffery is that the statement offers "only general claims of superiority" rather than a claim that is "specific and measurable."  *Id.* at 945–46 (collecting cases).  Here, a reasonable jury could find that the statements at issue are not general claims of superiority or expressions of the seller's opinion, but

rather specific and measurable claims as to Merck Germany's presence in the United States upon which a reasonable consumer would rely.

Accordingly, Merck Germany's motion for summary judgment with respect to Count Eight for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), is **DENIED**.[9]

### ii.    New Jersey Law, N.J.S.A. § 56:8-2 (Count Nine)

Merck Germany argues that Merck U.S.'s claim for deceptive trade practices under the NJCFA should be dismissed because, as a competitor, Merck U.S. lacks standing to bring such a claim.  (Mov. Br. at 28).  Merck U.S. responds only in a footnote.  (Opp. at 29 n.11).  For the following reasons, the Court agrees with Merck Germany.

The NJCFA provides the right to initiate a private cause of action to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result" of a violation of the statute. N.J.S.A. § 56:8–19.  The statute defines "person" to include "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association."  *Id.* § 56:8–1(d).  The New Jersey Legislature enacted the statute to limit sharp business practices and dealings, and to protect consumers from being "victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices."  *Daaleman v. Elizabethtown Gas Co.*, 390 A.2d 566, 569 (N.J. 1978).  Indeed, the NJCFA "was designed to protect consumers."  *J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1272 (3d Cir. 1994).  Thus, the statute "'is not intended to cover every transaction that occurs in the marketplace[,]' but, rather, '[i]ts applicability is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself.'"  *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514 (3d Cir. 2006) (alterations

---

[9]    Because there are genuine disputes as to at least two elements of Merck U.S.'s false advertising claim under the Lanham Act, the Court need not address Merck Germany's remaining arguments.  (*See* Mov. Br. at 23–27).

in original) (quoting *Arc Networks, Inc. v. Gold Phone Card Co.*, 756 A.2d 636, 637 (N.J. Super. Ct. Law Div. 2000)).

"[A] corporation may qualify as a person under the Act when it finds itself in a consumer[-]oriented situation," such as when a corporation purchases goods for consumption or use in the course of business. *J & R Ice Cream Corp.*, 31 F.3d at 1273 (quoting *BOC Grp., Inc. v. Lummus Crest, Inc.*, 597 A.2d 1109, 1112–13 (N.J. Law Div. 1990)); *see also Naprano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 509 (D.N.J. 1999) (finding construction company's purchase of a crane for use in construction was covered by the NJCFA). Thus, "to be a consumer respecting the transaction in question, the business entity must be 'one who uses (economic) goods, and so diminishes or destroys their utilities.'" *City Check Cashing, Inc. v. Nat'l State Bank*, 582 A.2d 809, 811 (N.J. App. Div. 1990) (quoting *Hundred East Credit Corp. v. Eric Schuster*, 515 A.2d 246, 246 (N.J. App. Div. 1986)). Accordingly, to determine standing under the NJCFA, a court should consider "the character of the transaction rather than the identity of the purchaser." *J & R Ice Cream Corp.*, 31 F.3d at 1273.

Applying those principles here, the Court finds that Merck U.S. does not have standing to bring a claim under the NJCFA. The nature of the alleged actions of Merck Germany is not of the sort that the statute covers. Indeed, Merck U.S. does not allege, much less argue, that it engaged in a "consumer-oriented" transaction with Merck Germany for the products or services featured in the advertisements alleged to be deceptive under the statute. Rather, Merck U.S. bases its claim on its status as a competitor of Merck Germany. (*See* Compl. ¶¶ 18 & 145–50).

The cases cited by Merck U.S. do not lead to a contrary conclusion. Merck U.S. relies on a line of cases that seemingly support the position that commercial competitors may have standing to sue under the NJCFA. (Opp. at 29 n.11 (citing *800-JR Cigar, Inc. v. GoTo.com, Inc.*,

437 F. Supp. 2d 273, 295–96 (D.N.J. 2006); *Gen. Dev. Corp. v. Binstein*, 743 F. Supp. 1115,

1131 (D.N.J. 1990); and *Hart v. Elec. Arts, Inc.*, 740 F. Supp. 2d 658, 669 (D.N.J. 2010))).

These decisions rely on a New Jersey Chancery Division case, *Feiler v. New Jersey Dental

Ass'n*, 467 A.2d 276 (N.J. Super. Ct. Ch. Div. 1983), which did not involve NJCFA claims.

Rather, it appears the plaintiff in *Feiler* brought a state law claim for unfair competition, and that

the court's analysis dealt with standing in that context. *Id.* at 278–80. As such, the Court is not

persuaded by the authorities upon which Merck U.S. relies.

 While there does not appear to be a New Jersey Supreme Court case that directly

addresses this issue, the Court finds persuasive recent District Court cases that have rejected the

notion that competitors suffering non-consumer like injuries have standing to sue under the

NJCFA. *See, e.g.*, *Trans USA Prod., Inc. v. Howard Berger Co.*, No. 07-5924, 2008 WL

3154753, at *6 (D.N.J. Aug. 4, 2008) (finding that the NJCFA "is not intended to protect

competitors such as [p]laintiff that do not suffer a consumer-like injury"); *IDT Telecom, Inc. v.

CVT Prepaid Sols., Inc.*, No. 07-1076, 2009 WL 5205968, at *6 (D.N.J. Dec. 28, 2009) (having

surveyed New Jersey state and federal decisions, commenting that "no court [has] explicitly

[held] that a competitor has standing to sue under the NJCFA").

 Merck U.S. has not cited any binding authority or advanced any reasoning to support a

prediction that New Jersey's Supreme Court would extend the scope of the NJCFA to the instant

case. Here, because Merck U.S., a competitor of Merck Germany, does not allege that it suffered

any consumer-oriented injuries, the Court finds that Merck U.S. lacks standing to sue under the

statute.

 Accordingly, because Merck U.S. lacks standing, Merck Germany's motion for summary

judgment with respect to Count Nine for deceptive trade practices under the NJCFA, N.J.S.A. §

56:8-2, is **GRANTED**.

### C.  Dilution

Finally, Merck Germany moves for summary judgment on Merck U.S.'s trademark dilution claims under federal and state law.  The Court begins its discussion with the dilution claim brought under the Lanham Act, followed by that brought under New Jersey law.

### i.  Lanham Act, 15 U.S.C. § 1125(c) (Count Three)

To establish a claim for dilution under the Lanham Act, a plaintiff must show the following: (i) its mark is famous; (ii) the defendant is making commercial use in interstate commerce of the mark or trade name; (iii) the defendant began use after the mark became famous; and (iv) the defendant's use is likely to cause dilution.  15 U.S.C. § 1125(c)(1).  Merck Germany argues that Merck U.S.'s federal dilution claim fails as a matter of law because Merck U.S. fails to show the first and third of these elements—that "Merck" is a famous mark and that its use of the mark began *after* it became famous.  (Mov. Br. at 28–39).  In response, Merck U.S. argues that genuine issues of material fact preclude summary judgment with respect to each of these elements.  (Opp. at 29–39).  Because the issue of fame is dispositive of Merck U.S.'s dilution claim, the Court confines its discussion to the issue of whether "Merck" is a famous mark.  For the following reasons, the Court agrees with Merck U.S. because a reasonable jury may find that its mark is famous.

A mark is considered famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  "This is a rigorous standard, as it extends protection only to highly distinctive marks that are well-known throughout the country."  *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007).  Whether a mark has reached this level of widespread recognition is

generally a question for the trier of fact, not summary judgment.  *See, e.g.*, *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 (9th Cir. 2008).  As one leading commentator observes, fame "is difficult to prove."  J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 24:104 (5th ed. 2022) (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012)).  To determine fame, "a court may consider all relevant factors," including those listed below.

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A)(i)–(iv).  The statute does not require that courts strictly apply each factor.  *Times Mirror Mags., Inc. v. Las Vegas Sports News, LLC*, 212 F.3d 157, 166 (3d Cir. 2000).  "Factor three, the extent of actual recognition, is perhaps the most significant factor, as it directly shows how widely recognized the mark is."  *Steak Umm Co. v. Steak 'Em Up, Inc.*, No. 09-2857, 2011 WL 3679155, at *8 (E.D. Pa. Aug. 23, 2011) (citing *McCarthy on Trademarks* § 24:106).  This factor "is meant to incorporate survey evidence, market research such as brand awareness studies and unsolicited media coverage and other evidence of actual recognition."  *McCarthy on Trademarks*, § 24:106 n.14 (quotations omitted).  Though survey evidence is considered persuasive, "direct evidence of recognition through survey responses is not required."  *Am. Mensa, Ltd. v. Inpharmatica, Ltd.*, No. 07-3283, 2008 WL 11363280, at *13 (D. Md. Nov. 6, 2008) (collecting cases); *see also Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*,

No. 10-3738, 2015 WL 12684340, at *9 (C.D. Cal. Apr. 10, 2015) (same).

Merck U.S. sets forth sufficient facts that create a genuine dispute as to whether its mark is famous.  Merck U.S. presents three expert reports that suggest the Merck brand is a well-recognized brand among consumers throughout the United States.  (D.E. No. 188-24, Ex. X to Bannigan Decl., Expert Report of Dominique M. Hanssens, Ph.D. ("Hanssens Report") ¶¶ 35–43 & 53; D.E. No. 188-31, Ex. EE to Bannigan Decl., Expert Report of Yoram (Jerry) Wind, Ph.D. ("Wind Report") ¶¶ 48–56 & 59–68; D.E. No. 189-14, Ex. 12 to Mundel Decl., Expert Report of Vince Parry, ¶¶ 22–26 & 33).[10]  In addition, Gerard Devlin, Merck U.S.'s managing counsel, testified that "Merck" has "general recognition" among the general public and relevant stakeholders.  (D.E. No. 188-15, Ex. O to Bannigan Decl. at 189:23–190:2).[11]  Further, Devlin testified that the majority of Merck U.S. product sales throughout the United States "include the Merck brand."  (*Id.* at 180:14–181:6).  Moreover, it is undisputed that Merck U.S. has owned exclusive rights in the "Merck" trademark throughout the United States for decades.  (*See* D.E. No. 188-1, Ex. A to Bannigan Decl. ¶ 2(b); *see also* D.E. No. 188-2, Ex. B to Bannigan Decl. ¶ 2(b); Compl. ¶ 29; *see generally* Def. SMF & Pl. Resp. SMF).  In addition, Merck Germany's own brand research showed that participants viewed the Merck brand as a "major pharmaceutical player" and was "the best[-]known company" of the five pharmaceutical companies studied. (D.E. No 189-6, Ex. 4 to Mundel Decl. at 10 & D.E. No 189-32, Ex. 30 to Mundel Decl. at 9). Therefore, the factual record is not so "clear-cut" as to say that a reasonable jury could not find

---

[10]    Merck Germany's argument that the first two of these reports offer "conclusory" opinions is unavailing. (Mov. Br. at 35 (citing Hanssens Report ¶ 11 & Wind Report ¶ 2)).  While an expert's testimony that lacks evidentiary support is of no assistance to the fact finder, *see Kuhar v. Petzl Co.*, No. 16-0395, 2018 WL 6331682, at *4 (D.N.J. Dec. 4, 2018), the reports are based on, among other things, marketing literature and Merck Germany's own brand research and internal documents.  (*See* Hanssens Report ¶¶ 42–43 & 53; *see also* Wind Report ¶¶ 48–49, 55–56 & 59–68).

[11]    Merck Germany's argument that Devlin's testimony alone is insufficient to show fame is similarly unavailing because Merck U.S. does not rely on this evidence alone.  (*See* Mov. Br. at 34–35).

that the "cumulative effect of the facts in the record" supports a finding that the mark is famous. *See Alumet Supply, Inc. v. Alumet Mfg., Inc.*, No. 02-5759, 2006 WL 8457439, at *6 (D.N.J. June 5, 2006).

Merck Germany focuses on challenging Merck U.S.'s additional evidence, particularly survey and ranking evidence, as inadmissible and insufficient to show fame.  (Mov. Br. at 30–34 (citing D.E. Nos. 188-26 to 188-30, Exs. Z, AA, BB, CC & DD to Bannigan Decl.)).  Because Merck U.S. presents sufficient evidence to create a genuine issue of material fact as to fame apart from its survey evidence, the Court need not reach the issue of admissibility of Merck U.S.'s survey and ranking evidence at this time.  Even assuming admissibility, evaluation of such evidence is a fact-intensive inquiry appropriate for a jury.  *See, e.g.*, *Jada Toys, Inc.*, 518 F.3d at 635.

Merck Germany's objection to Merck U.S.'s remaining evidence—particularly sales and advertising-spend data—does not defeat the genuine issues of material fact raised by Merck U.S.  (Mov. Br. at 36–38).  Specifically, Merck Germany takes issue with Merck U.S.'s sales and advertising-spend data because it argues Merck U.S. has not shown to what extent exactly the data reflects use of the mark, and "[u]nderstanding the relationship between sales and advertising and the mark at issue would be necessary to infer that sales and advertising impacted consumer perception of the mark."  (*Id.* at 36).  To start, Merck U.S. provided expert evidence on the relationship between corporate brand use and corresponding sales of products.  (*See* Hanssens Report ¶¶ 5–45 & 73–91).  And, importantly, Merck U.S. does not rely on such data alone to show fame.  Nonetheless, the proper inference to be drawn from such data "is a question for trial, not summary judgment."  *Acad. of Motion Picture Arts & Scis.*, 2015 WL 12684340, at *8.

Therefore, genuine issues of material fact as to whether the "Merck" mark is famous

throughout the United States preclude summary judgment.  Accordingly, Merck Germany's motion for summary judgment with respect to Count Three for trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c), is **DENIED**.

### ii.    New Jersey Law, N.J.S.A. § 56:3-13.20 (Count Five)

New Jersey's dilution statute is the state-law equivalent to the federal dilution statute, with the additional requirement that a plaintiff show that the mark is famous "in this State." N.J.S.A. § 56:3-13.20; *see also Jews for Jesus*, 993 F. Supp. at 310–11.  Merck Germany argues that Merck U.S.'s dilution claim under New Jersey law fails because Merck U.S. has not shown "New Jersey-specific" fame.  (Mov. Br. at 39).  In response, Merck U.S. relies on its argument as to its federal dilution claim.  (Opp. at 39 n.18).  For the reasons stated above, the record contains sufficient evidence to lead a reasonable jury to conclude that the "Merck" mark is famous throughout the United States, including New Jersey.  *See Kars 4 Kids Inc. v. Am. Can!*, No. 14-7770, 2018 WL 5298406, at *9 (D.N.J. Oct. 25, 2018) (denying summary judgment on dilution under both federal and New Jersey law where there were genuine issues of material fact as to whether the mark was famous).  Therefore, genuine issues of material fact as to whether the "Merck" mark is famous in New Jersey preclude summary judgment.

Accordingly, Merck Germany's motion for summary judgment with respect to Count Five for trademark dilution under New Jersey law, N.J.S.A. § 56:3-13.20, is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, Merck Germany's motion for partial summary judgment (D.E. No. 186) is **GRANTED-in-part** and **DENIED-in-part**.  An appropriate Order follows.


Dated: September 30, 2022                              *Esther Salas*
                                                      **Hon. Esther Salas, U.S.D.J.**