Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MERCK & CO., INC. and MERCK SHARP & DOHME CORP.,<br><br>Plaintiffs,<br><br>v.<br><br>MERCK KGaA,<br><br>Defendant. | Civil Action No.: 16-00266 (ES) (MAH)<br><br>OPINION<br><br>*FILED UNDER SEAL* |

SALAS, DISTRICT JUDGE

This comes before the Court on the parties' motions in limine. (D.E. Nos. 261, 262, 264, 268, 269 & 271). The Court has carefully considered the parties' submissions and other relevant portions of the record, and conducted oral argument on July 31, 2025. The Court now resolves the parties' applications as described in detail herein.

## I.    BACKGROUND

In this action, Merck & Co., Inc. and its wholly owned subsidiary, Merck Sharp & Dohme Corp. (collectively, "Plaintiffs"), allege Merck KGaA ("Defendant") misused Plaintiffs' rights to the "MERCK" mark in the United States, in violation of federal and New Jersey state law. (D.E. No. 1 ("Compl.") ¶ 1).

Relevant to the instant motion, Plaintiffs and Defendant share a common corporate heritage. (Compl. ¶ 10). The Merck family established a pharmacy in Darmstadt, Germany, in 1668 and Defendant is a corporate successor to that entity. (D.E. No. 275 ("Foreign Use Opp. Br.") at 2). In 1890, the Merck family established Merck & Co. as a United States affiliate. (*Id.*

at 3 (citing D.E. No. 197-2 ¶ 3)).  The U.S. Government seized that iteration of Merck & Co. in 1917 in connection with World War I.  (*Id.* (citing D.E. No. 197-2 ¶ 4)).  A new Merck & Co., independent of Defendant's predecessors, was ultimately formed as a separate legal entity.  (*Id.*). Plaintiffs are the corporate successors of that "new" entity.  (*Id.*).

Over the years, the parties have entered into global coexistence agreements to govern their respective uses of the "MERCK" mark around the world.  (Compl. ¶¶ 11–12; Foreign Use Opp. Br. at 3).  In 1970, the parties' predecessors signed the operative coexistence agreement at issue in this case ("1970 Coexistence Agreement").  (Compl. ¶ 12; Foreign Use Opp. Br. at 3).  Paragraph 2 of the 1970 Coexistence Agreement governs the parties' rights in the United States and Canada and recognizes that Plaintiffs have the exclusive right to use the "MERCK" trademark in those jurisdictions.  (D.E. No. 265 ("Foreign Use Mov. Br.") at 2).  Since executing the 1970 Coexistence Agreement, the parties have had disagreements about one another's use of the "MERCK" mark across jurisdictions, some of which have resulted in litigation abroad.  (Compl. ¶¶ 14–15; D.E. No. 8 ¶ 1).

Plaintiffs represent that, in 2015, "as part of a ███████████ rebranding campaign, [Defendant] replaced what had been its former umbrella brand, 'EMD,' with 'Merck KGaA, Darmstadt Germany' as a trademark and brand in the United States."  (Foreign Use Mov. Br. at 3).  Plaintiffs allege that Defendant launched its rebranding initiative with the goal of becoming known as "Merck *worldwide*."  (Compl. ¶¶ 25 & 52).  Indeed, Plaintiffs base their claims, in relevant part, on Defendant's alleged use of "MERCK" as a "trade name in the United States" and "as a cornerstone of its U.S. branding."  (*Id.* ¶¶ 37–39 & 41–85).  Plaintiffs allege that, in connection with that rebranding, Defendant has used "MERCK" alone on its websites and social

media accessible in the United States, which led Plaintiffs to initiate the present suit. (Foreign Use Mov. Br. at 3; Compl. ¶¶ 25 & 52).

Additionally, Plaintiffs allege that Defendant engaged in illicit cybersquatting by registering domain names (accessible in the U.S.) containing the words "Merck Manual," which automatically redirect internet users to Defendant's website. (Compl. ¶¶ 70–72 (listing, for example, www.merckmanual.jobs, www.merckmanuals.jobs, www.merck-manual.jobs, www.merck-manuals.com, www.merckmanual.org)). Plaintiffs own trademark rights to THE MERCK MANUAL, which is a medical treatise used by both professionals and consumers. (*Id.* ¶ 71). Plaintiffs allege that Defendant registered these domain names in bad faith to redirect U.S. users searching for THE MERCK MANUAL. (*Id.* ¶ 72).

On January 15, 2016, Plaintiffs filed an eleven-count Complaint against Defendant containing the following claims, all hinging on Defendant's use of "MERCK" in the U.S.:

1. **Count I:** Federal Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114(1)

2. **Count II:** Federal Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125(a)

3. **Count III:** Federal Trademark Dilution Under the Lanham Act, 15 U.S.C. § 1125(c)

4. **Count IV:** Trademark Infringement Under N.J. Stat. § 56.3-13.16

5. **Count V:** Trademark Dilution Under N.J. Stat. § 56.3-13.20

6. **Count VI:** Unfair Competition Under N.J. Stat. § 56.4-1

7. **Count VII:** New Jersey Common Law Unfair Competition

8. **Count VIII:** Federal False Advertising Under the Lanham Act 15 U.S.C. § 1125 (a)(1)(B)

9. **Count IX:** Deceptive Trade Practices Under N.J. Stat. § 56.8-2

10. **Count X:** New Jersey Common Law Breach of Contract

11.    **Count XI:** Cybersquatting Under the Anticybersquatting Consumer Protection Act 15 U.S.C. § 1125(d)

(Compl. at ¶¶ 86–159). Each of these claims remains in the case to date, with the exception of Count IX—Plaintiffs' claim for "Deceptive Trade Practices" in violation of the New Jersey Consumer Fraud Act. The Court granted summary judgment on that claim, in Defendant's favor, by Order dated September 30, 2022. (D.E. No. 204).

Plaintiffs seek both monetary and injunctive relief. With regard to the former, Plaintiffs seek an accounting of (and an award of associated damages for): (i) all monetary gains Defendant received from the acts complained of; (ii) damages incurred by Plaintiffs, "including enhanced damages (up to treble damages) as authorized by 15 U.S.C. § 1117 and N.J. Stat. § 56.4-2"; (iii) punitive and exemplary damages to be determined by the Court; and (iv) Plaintiffs' costs and disbursements in this action. (Compl. at 54 ¶ 6). Plaintiffs also request that the Court find this case to be an "exceptional case" within the meaning of 15 U.S.C. § 1117, (*id.* at 54 ¶ 5), which would then permit the Court to "award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117. Plaintiffs also seek various forms of equitable relief, including orders: (i) barring Defendant from continuing to engage in trademark infringement (*id.* at 53 ¶ 2); (ii) barring Defendant from using in commerce false or misleading descriptions and representation of facts (*id.* at 54 ¶ 3); (iii) cancelling Defendant's domain registrations containing THE MERCK MANUAL trademark (*id.* at 54 ¶ 4); and (iv) requiring Defendant "to remove from any websites or social media and to deliver up for destruction any . . . materials" bearing the MERCK trademark (*id.* at 55 ¶ 7).

By Order dated March 6, 2024, the Hon. Michael A. Hammer, U.S.M.J. established protocols for the parties' submission of *in limine* motions. (D.E. 247). The parties filed the following six applications pursuant to Judge Hammer's instructions:

1.    Defendant's Motion to Exclude Certain Opinions & Testimony of Plaintiffs' Expert Dominique M. Hanssens, (D.E. No. 261);

2.    Plaintiffs' Motion to Exclude Overseas Trademark Use & Foreign Litigations, i.e., to preclude Defendant from presenting any evidence, argument, or reference to overseas trademark use & foreign litigations, pursuant to Federal Rules of Evidence 401, 402, & 403, (D.E. No. 262);

3.    Plaintiffs' Motion to Exclude Testimony of Defendant's Expert Mr. Philip Green, pursuant to FREs 401, 402, & 702, (D.E. No. 264);

4.    Defendant's Motion to exclude the opinions and testimony of Plaintiffs' healthcare branding rebuttal expert Vince Parry, pursuant to Federal Rule of Evidence 702, (D.E. No. 268);

5.    Plaintiffs' Motion to partially exclude certain opinions and testimony of Defendant's marketing rebuttal expert Dr. Joel Steckel, pursuant to Federal Rule of Evidence 702, (D.E. No. 269); and

6.    Defendant's Motion to exclude the opinions and testimony of Plaintiffs' marketing and branding expert Dr. Yoram "Jerry" Wind, pursuant to Federal Rule of Evidence 702, (D.E. No. 271).

The Court conducted oral argument on each of the parties' motions *in limine* on July 31, 2025. (*See generally* D.E. No. 301 ("OA Tr.")).

## II.    LEGAL STANDARDS

"[A] motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *U.S. for Use of Colo. Custom Rock Corp. v. G&C Fab-Con, LLC*, No. 20-2968, 2024 WL 624040, at *1 (D.N.J. Feb. 14, 2024) (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990)). Such motions "allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Id.* at *2 (quoting *United States v. Tartaglione*, 228 F. Supp. 3d 402, 406 (E.D. Pa. 2017)). However, "[e]vidence should not be excluded pursuant to a motion *in limine*, unless it is clearly inadmissible on all potential grounds." *Id.* (quoting *Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013)). Additionally, the "movant bears the burden of demonstrating that the

evidence is inadmissible on any relevant ground, and the court may deny a motion *in limine* when it lacks the necessary specificity with respect to the evidence to be excluded." *Id.* (quoting *Leonard*, 981 F. Supp. 2d at 276).

### a.    Federal Rules of Evidence 401 and 402

Federal Rule of Evidence 402 provides that evidence must be relevant to be admissible. *Forrest v. Beloit Corp.*, 424 F.3d 344, 355 (3d Cir. 2005) (citing Fed. R. Evid. 401; Fed. R. Evid. 402). Pursuant to Federal Rule of Evidence 401, evidence is relevant if: (a) "it has any tendency to make a fact more or less probable than it would be without the evidence"; and (b) "the fact is of consequence in determining the action." Fed. R. Evid. 401. The United States Court of Appeals for the Third Circuit's precedent makes clear that "[t]he definition of relevant evidence is very broad," *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004), and Rule 401 "does not raise a high standard," *id.* (quoting *Hurley v. Atl. City Police Dept.*, 174 F.3d 95, 109–110 (3d Cir. 1999)). In fact "evidence is irrelevant only when it has no tendency to prove [a consequential fact]." *Id.* (alteration in original) (quoting *Spain v. Gallegos*, 26 F.3d 439, 452 (3d Cir. 1994)). Thus, while Rule 401 "gives 'judges great freedom to admit evidence, [it] diminishes substantially their authority to exclude evidence as irrelevant.'" *Id.* (alteration in original) (quoting *Spain*, 26 F.3d at 452).

### b.    Federal Rule of Evidence 403

Federal Rule of Evidence 403 ("Rule 403") provides that a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 403 "'is an "umbrella rule" spanning the whole of the Federal Rules of Evidence,' and as such trial judges must apply Rule 403 'in tandem with other Federal Rules under which evidence would be admissible.'" *Forrest*, 424 F.3d

at 355 (quoting *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 (3d Cir. 2002)). Under Rule 403, "a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility." *Id.* (quoting *Coleman*, 306 F.3d at 1343). "However, there is a strong presumption that relevant evidence should be admitted"; thus, "for exclusion under Rule 403 to be justified, the probative value of evidence must be 'substantially outweighed' by the problems in admitting it." *Coleman*, 306 F.3d at 1343–44. Consequently, "evidence that is highly probative is exceptionally difficult to exclude." *Id.* at 1344 (citation omitted). Rule 403 therefore requires a district court to "engage in balancing to determine whether the probative value of the evidence is 'substantially outweighed' by the negative factors listed in Rule 403." *Id.* (citation omitted). "'[T]he proper equation places on one side the maximum reasonable probative force for the offered evidence,' while 'the other side of the equation should include the likely prejudicial impact of the evidence.'" *Id.* (citation omitted). This balancing test ensures that "juries are not presented with evidence that is far less probative than it is prejudicial." *Id.*

### c.     Federal Rule of Evidence 702

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). However, this gatekeeping function is a "flexible" one, *Daubert v. Merrell Dow Pham., Inc*, 509 U.S. 579, 594 (1993), and "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." *Kannankeril*, 128 F.3d at 806. "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: [i] qualifications, [ii] reliability, and [iii] fit." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).

Ultimately, "[t]he overriding consideration with regard to these three factors is that expert testimony should be admitted if it will assist the trier of fact." *United States v. Williams*, 235 F. App'x 925, 927 (3d Cir. 2007) (citing *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir.1995)). "The proponent of the expert testimony must prove these three requirements by a preponderance of the evidence." *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 829 (D.N.J. 2015) (citing *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir.2013)). The Court will examine each in turn.

*First*, "[t]he qualification prong of *Daubert* refers to the requirement that the witness possess specialized expertise." *MD Retail Corp. v. Guard Ins. Grp.*, No. 14-6589, 2017 WL 1164499, at *5 (D.N.J. Mar. 28, 2017). The Third Circuit has "interpreted Rule 702's qualification requirement liberally." *Pineda*, 520 F.3d at 244 (first citing *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); and then citing *In re Paoli*, 35 F.3d 717, 741 (3d Cir. 1994)). An expert may be qualified by "broad range of knowledge, skills, and training." *In re Paoli*, 35 F.3d at 741. Indeed, the Third Circuit has "stated that 'it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the *best* qualified or because the proposed expert does not have the specialization that the court considers *most* appropriate.'" *Kannankeril*, 128 F.3d at 809 (emphasis added) (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)). Nevertheless, "'a proffered expert witness . . . must possess skill or knowledge greater than the average layman.'" *Betterbox Commc'ns Ltd. v. BB Techns., Inc.*, 300 F.3d 325, 328 (3d Cir. 2002) (citation modified) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir.1998)). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril*, 128 F.3d at 809 (citing *In re Paoli*, 35 F.3d at 741).

*Second*, with respect to the "reliability" prong, the Third Circuit has held that "an expert's

8

testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Pineda*, 520 F.3d at 244 (citing *Kannankeril*, 128 F.3d at 806). This "'reliability analysis [required by *Daubert*] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (brackets in original) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.1999)). However, the district court enjoys "considerable discretion" to "determine the criteria for judging reliability under the particular circumstances." *Betterbox Commc'ns Ltd.*, 300 F.3d at 329. Generally, an expert's conclusion must rest upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Daubert*, 509 U.S. at 590); *In re Paoli*, 35 F.3d at 732 (an "expert's conclusion" is reliable if it "is based on good grounds (the methods and principles of science))." This evaluation is flexible, and courts have generated a non-exhaustive list of factors to consider when determining whether an expert's opinion is reliable. *Pineda*, 520 F.3d at 247–48 (citing *In re Paoli*, 35 F.3d at 742 n.8).

In *Daubert*, the Supreme Court "noted factors relating to the reliability of an expert's scientific methodology, including whether the theory or technique 'can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' whether the known or potential error rate is acceptable, and whether it is generally accepted within a relevant scientific community." *Betterbox Commc'ns Ltd.*, 300 F.3d at 329 (citing *Daubert*, 509 U.S. at 593–94). In non-scientific cases such as this one, however, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 150 (1999) (internal

quotations omitted). In such cases, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. Accordingly, a Court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *In re TMI Litig.*, 193 F.3d 613, 665–66 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (quoting *Heller*, 167 F.3d at 153).

"While a litigant has to make more than a *prima facie* showing that his expert's methodology is reliable," it need not be perfect and the expert's opinion does not necessarily need to be correct. *Pineda*, 520 F.3d at 247 (quoting *In re Paoli*, 35 F.3d at 744); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3d Cir. 2000) ("The test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'") (quoting *Kannankeril*, 128 F.3d at 806). Notably, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Oddi*, 234 F.3d at 146 ("'The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.'") (quoting *Kannankeril*, 128 F.3d at 806).

***Third,*** to satisfy the "fit" requirement, Rule 702 requires that an "expert's scientific, technical, or other specialized knowledge ... help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). To be helpful, expert testimony must be "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual

dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (quotation marks and citation omitted).

Finally, the court also "must ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). "Although [Rule 704] permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Id.* (internal quotations omitted).

## III.    DISCUSSION

### a.    Defendant's Motion to Exclude Certain Opinions and Testimony of Plaintiffs' Expert Dominique M. Hanssens

One of Plaintiffs' experts, Dr. Dominique Hanssens, has offered opinions on multiple issues related to Defendant's alleged infringement. At issue here are his opinions on two types of potential damages: (1) the proper amount of disgorgement for Defendant's allegedly unlawful use of the "Merck" name; and (2) compensatory damages (i.e., profits Plaintiffs would have made but for Defendant's alleged misconduct). (*See generally* D.E. No. 267 ("Hanssens Mov. Br.")). Defendant seeks to exclude both sets of opinions on multiple grounds, but does not challenge Dr. Hanssens's qualifications. (*Id.*). For the reasons that follow, the Court will **DENY** Defendant's motion in its entirety.

### i. Disgorgement

Defendant argues that the Court should exclude Dr. Hanssens's opinions on disgorgement damages because: (i) they are just "simple arithmetic", and would therefore not be helpful for the jury, as such calculations don't require the application of any specialized knowledge (*id.* at 3–5); (ii) they are "irrelevant" and "not based on the application of any 'reliable principles or methods' to the facts of this case" as Dr. Hanssens concluded that *all* of Defendant's profits should be

Case 2:16-cv-00266-ES-MAH    Document 335    Filed 04/08/26    Page 12 of 60 PageID:
16046
Case 2:16-cv-00266-ES-MAH    Document 302 *SEALED*    Filed 11/12/25    Page 12 of 60
PageID: 13587

disgorged—without connecting those profits to the alleged misconduct at issue (*id.* at 5–10); (iii)

Dr. Hanssens's proposed disgorgement would be punitive, rather than compensatory; (*id.* at 10–

12); and (iv) Dr. Hanssens's disgorgement opinions would be unduly prejudicial and are thus

barred under Federal Rule of Evidence 403. (*Id.* at 27–28).

At oral argument, the parties agreed that disgorgement is an equitable remedy that the Court

will ultimately evaluate,[1] and that no testimony or evidence on disgorgement issues would have to

go before a jury unless the Court, in its discretion, elects to have the jury issue an advisory opinion

on the subject. (OA Tr. at 6:6–7:8; 11:15–22). Defendant represented that it does not seek an

advisory opinion from the jury on disgorgement, (*id.* at 9:12–17), and the Court determined that it

will not ask the jury to provide one, (*id.* at 11:24–12:2). As there is no chance of Dr. Hanssens's

disgorgement opinion misleading or confusing a jury, the Court finds that Defendant's

"unhelpfulness" and Rule 403 arguments are moot. Defendant will have the opportunity to present

the remainder of its disgorgement arguments (e.g., relevance, punitive nature of the proposed

award), to the Court at the appropriate time. The Court will, therefore, deny Defendant's motion

to the extent it seeks to exclude Dr. Hanssens's opinion on disgorgement damages.

### ii. Compensatory Damages

Turning next to Dr. Hanssens's analysis regarding compensatory damages (i.e., Plaintiff's

lost profits), Defendant argues that those opinions are unreliable because he: (i) "cherry picked"

a start date of June 2015 for his regression models; (ii) improperly used a "dummy variable" in

those analyses; (iii) used an inappropriately small sample size; (iv) failed to account for several

key variables; and (v) failed to properly address these issues in his supplemental report (and created

---

[1]    *Smart Vent Prods., Inc. v. Crawl Space Door Sys. Inc.*, No. 13-5691, 2020 WL 5700736, at *5 (D.N.J. Sept. 24, 2020) (noting that the determination of whether to impose disgorgement damages is "squarely in the province of the Court").

new shortcomings therein).  (Hanssens Mov. Br. at 13–27).  Defendant also contends that permitting Dr. Hanssens to present that opinion to a jury would be unduly prejudicial and thus improper under Federal Rule of Evidence 403.  (*Id.* at 27–29).  The Court will consider these points in turn.

The Court begins by evaluating Defendant's "reliability" arguments.  Having carefully considered the parties' arguments on each of these points, the Court finds that Dr. Hanssens's methodology for his regression analysis is sufficiently reliable to survive a challenge under Rule 702.  "Generally speaking, regression analysis seeks to define statistically the relationship between a dependent variable [*e.g.*, sales] and one or more independent variables [*e.g.*, drug prices].  Multiple regression analysis allows one to control for other independent variables so as to isolate and identify the effect of a single independent variable [*i.e.*, Defendant's allegedly wrongful activity] on the dependent variable."  *Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 261, n.3 (3d Cir. 2004).  Such analyses "have been widely accepted in this Circuit."  *Id.* at 262.  As noted above, Defendant raises both general, macro-level attacks on Dr. Hanssens's methodology (e.g., criticism of the time period and sample sized used in the analysis) as well as specific challenges to Dr. Hanssens's choice of independent variables.  The Court will address each point individually.

### A.    June 2015 Start Date

Beginning with Defendant's macro-level attacks on Dr. Hanssens's methodology, the Court first examines Defendant's contention that Dr. Hanssens impermissibly "cherry picked" a June 2015 start date for his regression analysis, and that he was unable to explain why he picked that date as opposed to others—such as the 2013 timeframe during which Defendant made certain changes to its website.  Citing his deposition testimony, Defendant argues that Dr. Hanssens "could not explain why June 2015 was more significant or confirm that the 125 Years Campaign reached more viewers than Defendant's corporate website following the 2013 changes."  (Hanssens Mov.

13

Br. at 14). Dr. Hanssens admitted that he did not have a comparison on the raw numbers of people exposed to Defendant's 2013 website changes versus Defendant's 2015 advertising campaign. (D.E. No. 279-5 ("Hanssens Dep. Tr.") at 276:15–18). He explicitly testified, however, why he used the June 2015 start date as opposed to a date associated with Defendant's 2013 website update:

> It's because the 2015 initiative is across all of Merck KGaA, or all of Merck KGaA in the U.S., all divisions, and it is ordered by the highest levels, and it comes with very significant resources, I understand around ▮▮▮▮▮▮▮▮ While undoubtedly, there are some resource allocation to change your website back in 2013, that -- that can't come even close to the efforts that they did in 2015.

(*Id.* at 276:6–14). Thus, Dr. Hanssens expressed a sound basis for his decision. Moreover, it appears that nothing in the record, beyond defense counsel's speculation, suggests that Dr. Hanssens's damages analysis would have yielded different results (i.e., a lower lost profits calculation) had he selected a 2013 starting date for his analysis. Indeed, an earlier start date would still have captured the post-June 2015 period Dr. Hanssens ultimately tested, and would have also collected damages information for a longer period of time. In sum, based on the motion record, the Court finds that Dr. Hanssens's selection of a June 2015 start date for his regression analysis does not render his compensatory damages opinion unreliable.

### B.    Use of a Dummy Variable

The Court next examines Defendant's critique of Dr. Hanssens's use of a "dummy variable" to account for the impact of its rebranding efforts. Defendant argues that, because a dummy variable assumes that an event has a consistent impact over time, it should not be used in the context of advertising campaigns, which typically have a diminishing impact over time. (Hanssens Mov. Br. at 17). The Court notes, however, that while Dr. Hanssens selected June 2015 as the start date for his regression analysis because that timeframe coincided with the start of

Defendant's rebranding campaign, his analysis was not limited to the impact of that campaign, but also included Defendant's ongoing, allegedly infringing use of "Merck KGaA, Darmstadt, Germany", generally.  (D.E. No. 267-1, Ex. 2 ("Hanssens Report") at 35).  Indeed, the record reflects Defendant continued to use that name thereafter.  Likewise, Defendant offers nothing other than speculation about the impact of its advertising campaign over time.  The Court thus declines to find that Dr. Hanssens's use of a dummy variable to account for Defendant's alleged infringement renders his regression analysis unreliable.

### C.    Sample Size

The Court also rejects Defendant's argument that the sample size that Dr. Hanssens used in his analysis renders his opinion unreliable.  Defendant contends that Dr. Hanssens analyzed "a limited data sample size following June 2015—rendering the regression models incapable of accounting for any diminishing impact of the 125 years campaign."  (Hanssens Mov. Br. at 18).  Defendant points to Dr. Hanssens's acknowledgment that, while Defendant incurred the bulk of its expenses on the 125 Years Campaign between September 2015 and January 2015, he lacked data "regarding the relationship between marketing expenses and the timing of the marketing activities for which [Defendant] paid."  (*Id.*).  Defendant contends, without sufficient explanation, that this artificially focuses [Dr. Hanssens's] results on the perceived 2015 spike in Defendant['s] revenues and skews conclusions in Plaintiff's favor."  (*Id.* at 19).  Plaintiffs argue that Defendant failed to produce such information in discovery, despite being in sole possession of that data, and should therefore not be allowed to use its absence as a sword at this point in the proceedings.  (D.E. No. 279 ("Hanssens Opp. Br.") at 19).  Putting aside the inherent inequity in allowing a party to use apparent deficiencies in its own recordkeeping for its benefit, Defendant has not, in the scant briefing devoted to this point, identified anything in the record suggesting that the limitations in

question had any actual impact on Dr. Hanssens's findings. (Hanssens Mov. Br.at 18–19). The Court therefore declines to find Dr. Hanssens's analysis to be unreliable on this ground.[2]

### D.    Choice of Variables

The Court next turns to Defendant's argument that Dr. Hanssens failed to account for multiple critical variables when conducting his analysis. The Court notes that "the failure to include variables, where their necessity is reasonably debatable, does not require rejection of a regression as unreliable." *Castro*, 134 F. Supp. at 833 (D.N.J. 2015) (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)). In fact, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore*, 478 U.S. at 400 (Brennan, J., concurring). Only rarely are regressions "'so incomplete as to be irrelevant[,]'" such that "'the expert's decisions regarding control variables are the basis to exclude the analysis.'" *Castro*, 134 F. Supp. 3d at 833 (quoting *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06–0620, 2015 WL 5767415 at *11 (E.D. Pa. July 29, 2015)); *Gutierrez v. Johnson & Johnson*, No. 01-5302, 2006 WL 3246605, at *4–6 (D.N.J. Nov. 6, 2006) (same). For the Court to reach such a conclusion, there must be "a meaningful indication 'that the excluded variables would have impacted the results.'" *Id.* (quoting *In re Live Concert Antitrust Litig.*, 863 F.Supp.2d 966, 974 (C.D. Cal. 2012)).

In his initial report, Dr. Hanssens described using a multiple regression analysis to measure changes in the sales of two of Plaintiff's fertility products over time, "relative to the total sales of [the parties'] products combined." (Hanssens Report at 35). He used four independent variables in that analysis:  (i) "the prices for the Merck and KGaA drugs"; (ii) "the total marketing

---

[2]    The Court similarly rejects Defendant's argument that Dr. Hanssens's limited sample size, choice of a start date, and use of a dummy variable, taken together, "compound" each other such that they collectively "have a huge impact on driving up the damages numbers" and thus render his regression analysis unreliable. (*See e.g.*, Hanssens Mov. Br. at 13–14). If, as Defendant represents to the Court, the collective impact on Dr. Hanssens's damages calculations was "huge," why has Defendant not directed the Court to *any* information substantiating that point? Defendant has not shown how any of those factors impacted Dr. Hanssens's analysis. (*See e.g.*, OA Tr. at 14:24–18:15).

expenditures for the individual Merck drug"; (iii) "KGaA's promotional expenditures for the fertility business franchise"; and (iv) "the previous period's quantity share of the Merck drug . . . to account for factors that cause the share to vary based on past performance (rather than new factors), such as the prescribing habits of physicians or the impact of past marketing expenditures or prices." (*Id.* at 44). Defendant argues that Dr. Hanssens failed to account for the following six factors, each of which could have influenced sales numbers:  (i) Defendant's introduction of a "redi-ject pen" version of its Gonal-F IVF medication in 2013 (which increased its sales); (ii) Defendant's expansion of its pharmacy network between 2011 and 2016; (iii) Defendant's improved Gonal-F sales through partnerships with managed care organizations; (iv) Defendant's increased sales volumes through patient assistance programs; (v) Plaintiffs' reduction of their relevant sales force in 2015; and (vi) the fact that the sole third-party competitor withdrew from the market in October 2015, allowing Defendant to increase its market share. (Hanssens Mov. Br. at 20–22). Dr. Hanssens explicitly addressed each of those factors in his November 29, 2018 Reply Report, explaining why none of them impacted his conclusions.  (D.E. No. 267-1 at Ex. 3 ("Hanssens Reply Report") at 55–62).  Further, Dr. Hanssens adjusted his analysis to account for those factors, and he modified his damages calculations accordingly.  (*Id.* at 62).  While Defendant argues that certain aspects of Dr. Hanssens's revised analysis suffer from other problems—such as multicollinearity, a misuse of dummy variables, and a limited sample size—the Court notes that an expert's methodology need not be perfect to be considered reliable.  It need not even generate an objectively "correct" result.  The standard for reliability is less rigid.  The Court finds that Dr. Hanssens's multiple regression analysis is "certainly . . . not so fatally flawed to be inadmissible as a matter of law.  Defendant can seek to highlight its shortcomings on cross-examination." *Gutierrez*, 2006 WL 3246605 at *6.

### E.    Rule 403 Challenge

Finally, the Court examines Defendant's argument that it should exclude Dr. Hanssens's compensatory damages opinion under Rule 403.    Defendant argues, in essence, that methodological flaws in Dr. Hanssens's analysis—which jurors will not be able to detect due to its highly technical nature—reduce its probative value such that exposing jurors to that information would be unduly prejudicial to Defendant.  (Hanssens Mov. Br. at 27–29).  For the reasons the Court addressed above regarding Defendant's individual challenges, the Court does not find that any prejudicial effects of Dr. Hanssens's opinion "substantially outweigh" its probative value. *Coleman*, 306 F.3d at 1343–44.  The Court therefore rejects Defendant's application to exclude Dr. Hanssens's opinion on Rule 403 grounds.  In conclusion, Defendant's motion is denied to the extent it seeks exclusion of Dr. Hanssens's opinions regarding compensatory damages.

### b.    Plaintiffs' Motion to Exclude Overseas Trademark Use and Foreign Litigations

Plaintiffs represent that, when the parties submitted their proposed Final Pretrial Order for Judge Hammer's consideration, Defendant identified approximately 400 trial exhibits on Plaintiffs' use of the "MERCK" name abroad.  (D.E. No. 265 ("Foreign Use Mov. Br.") at 3). These included "screenshots, emails, letters, and articles" related to Plaintiffs' uses abroad, as well as "witness statements, transcripts, and decisions from a selection of foreign cases that [Defendant] filed" in other countries.  (*Id.*).  Plaintiffs surmise that Defendant will ask the Court to take judicial notice of opinions from foreign judiciaries and represent that Defendant "has designated deposition testimony it solicited from at least five fact witnesses on overseas uses."  (*Id.*).  Plaintiffs have filed a motion *in limine* to exclude evidence of:  (i) Plaintiffs' trademark use abroad; and (ii) decisions rendered by foreign courts related to Plaintiffs' trademark use abroad.  (*See generally id.*).

Plaintiffs assert two primary arguments as to why the Court should exclude this evidence from the jury's consideration. **First**, Plaintiffs argue that the foreign uses and court decisions that Defendant seeks to introduce are irrelevant and inadmissible under Federal Rules of Evidence 401 and 402 because: (i) foreign trademark uses are irrelevant to trademark infringement actions in the United States, as territoriality concerns limit U.S. trademark litigation to activities within U.S. borders, (*see id.* at 4–7); and (ii) Defendant's purported uses of foreign matters are not directly relevant to any claims or defenses that the parties will present to the jury, (*see id.* at 7–9). As a subpart to their "relevance" argument, Plaintiffs argue that "trademark rights exist in each country solely according to that country's statutory scheme." (*Id.* at 4). Simply put, countries grant trademarks and police trademarks differently within their respective borders, making foreign trademark uses and corresponding judicial decisions irrelevant to trademark disputes in the United States. (*Id.*). Plaintiffs argue this proposition is supported by case law, citing to trademark cases wherein federal courts found information regarding foreign trademark uses and judicial decisions to be irrelevant in domestic disputes. (*Id.* at 4–6). Because this case will involve an evaluation of Defendant's conduct in the United States under federal and state trademark law, as well as New Jersey contract law, Plaintiffs argue that evidence regarding their trademark usage abroad—and any corresponding court decisions—would be irrelevant to any claims or defenses in this case. (*Id.* at 5–6). **Second**, Plaintiffs contend that the Court should bar evidence regarding foreign trademark litigation pursuant to Federal Rule of Evidence 403, as that information carries such little probative value in relation to its potentially significant prejudicial effects (for example, the potential to confuse a jury). (*Id.* at 9–11).

Defendant argues that evidence pertaining to Plaintiffs' usage of the "MERCK" trademark abroad is relevant for several purposes, including: (i) defending against Plaintiffs' breach of

Case 2:16-cv-00266-ES-MAH    Document 302 *SEALED*    Filed 11/12/25    Page 20 of 60 PageID: 13595

contract claim, (D.E. No. 275 ("Foreign Use Opp. Br.") at 4–6); (ii) defending against Plaintiffs' trademark infringement claim—specifically with regard to the "intent" component, (*id.* at 6–7); (iii) defending against Plaintiffs' cybersquatting claim—also in connection with the "intent" component, (*id.* at 8); and (iv) asserting an unclean hands defense, (*id.* at 8–10). With regard to Plaintiffs' arguments under Rule 403, Defendant contends that (i) any such use would be limited in scope and purpose (accompanied by appropriate Court instructions establishing such boundaries) and would not require jurors to assess foreign trademark law; and (ii) such evidence may be relevant to its equitable "unclean hands" defense, "which will be decided by the Court, not the jury, thus minimizing any purported Rule 403 concerns." (*Id.* at 12–13). Defendant also argues that Plaintiffs' motion is overbroad, seeking a preemptive, wholesale bar on evidence of foreign trademark activity, without examining the admissibility of specific pieces of evidence. (*Id.* at 14–15).

The Court has determined that it would, for the most part, be inappropriate to issue blanket rulings, in a vacuum, regarding evidence of Plaintiffs' trademark usage abroad. Defendant has identified several instances in which such information may be relevant, and this Court agrees that it *may* be, depending on the context (for example, what the evidence is and how the parties intend to use it). Indeed, Plaintiffs admitted during oral argument that evidence related to foreign usage may be appropriate in certain circumstances. (OA Tr. at 66:17–25 (evidence may be used to probe a prior inconsistent statement regarding trademark usage) & 71:9–10 (e-mail correspondence between the companies may be relevant for the purpose of examining whether Defendant acted in good faith in the context of Plaintiffs' trademark infringement claim)). The Court holds that, for the vast majority of this evidence, it must make relevance determinations on a case-by-case basis, with the benefit of context. (*See, e.g.,* OA Tr. at 96:4–13).

The Court does issue *one* blanket ruling, however.  The Court will exclude evidence of foreign litigation (including litigation documents and judicial rulings) from presentation to the jury.  (*Id.* at 95:22–96:3).  Such evidence is irrelevant to the claims to be tried before a jury and creates a significant a risk of prejudice—particularly juror confusion—that outweighs any minimal probative value.  The Court stresses that this exclusion does *not* apply to Defendant's equitable "unclean hands" defense, which Defendant would present solely for the Court's consideration.  The parties may present any arguments regarding the admissibility of specific pieces of foreign litigation evidence, as appropriate, during that phase.

Based on the foregoing, Plaintiffs' motion to exclude evidence of their trademark activity abroad is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Plaintiffs' motion is granted to the extent that it seeks to exclude any evidence of foreign litigation from presentation to the jury. Plaintiffs' motion is otherwise denied without prejudice.

  **c.**   **Plaintiffs' Motion to Exclude Defense Expert Phillip Green's Testimony on Damages**

As discussed at length above, Plaintiffs' expert, Dr. Dominique Hanssens, has issued opinions on several issues, including the proper measures of both disgorgement and compensatory damages in this matter.  Defendant retained Mr. Philip Green to provide an opinion, (D.E. No. 266-1 (the "Green Report")), on Plaintiffs' damages and to rebut Dr. Hanssens's conclusions on that issue.  (Green Report at 1).  Mr. Green offers two opinions in his report.  First, he contends that Plaintiffs' claim for lost profits, as presented in Dr. Hanssens's report, is "speculative and not consistent with the facts of this matter."  (*Id.* at 2).  Second, he opines that Defendant "has not earned any profits attributable to its alleged trademark infringement or any of the other asserted causes of action in this matter."  (*Id.*).

Plaintiffs move to exclude Mr. Green's opinions pursuant to Federal Rules of Evidence 702, 401, and 402. (*See generally* D.E. No. 264). Plaintiffs argue that Mr. Green is unqualified to contest Dr. Hanssens's opinions as he lacks a background in econometrics, his methods (or lack thereof) do not provide a reliable basis for his determinations, and his testimony is irrelevant to Plaintiff's claims for damages under the Lanham Act. (*See generally* D.E. No. 266 ("Green Mov. Br."); D.E. No. 292 ("Green Reply Br.")). Defendant argues that Mr. Green is qualified by his extensive experience, that his methods (i.e., determinations based on that experience) are reliable, and that his opinions are relevant. (*See generally* D.E. No. 277 ("Green Opp. Br.")). Defendant also implicitly raises Rule 403 to argue that it would be unfair and prejudicial to admit Dr. Hanssens's opinions without admitting Mr. Green's rebuttals. (Green Opp. Br. at 11–12). Plaintiffs respond to the latter point by arguing that claims of unfairness do not trump evidentiary requirements. (Green Reply Br. at 10). The Court will deny Plaintiffs' motion in its entirety.

### i.  Mr. Green is Sufficiently Qualified

Plaintiffs argue that Mr. Green is unqualified to opine on Dr. Hansenss's multiple regression analysis because he lacks sufficient expertise in econometrics.[3] (Green Mov. Br. at 4–5; Green Reply Br. at 2–4). The Court finds, however, that Mr. Green *is* qualified to respond to Dr. Hanssens's report because he meets Federal Rules of Evidence 702's liberal qualification standards. "Qualification requires 'that the witness possess specialized expertise.' [The Third Circuit has] interpreted Rule 702's qualification requirement liberally." *Pineda*, 520 F.3d at 244 (quoting *Schneider,* 320 F.3d at 404). As Defendant notes, the Third Circuit has held that a "broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli*, 35 F.3d at 741. "[G]eneralized qualifications," rather than "overly rigorous requirements of expertise" are

---

[3]    "Econometrics is a branch of economics that applies statistical methods to study economic data." (Green Mov. Br. at 4 (citing MERRIAM- MERRIAM-WEBSTER.COM)).

satisfactory. *Id.*; *see also id.* (collecting cases). For instance, in *Hammond v. Int'l Harvester Co.,* 691 F.2d 646 (3d Cir.1982), a products liability action involving farm equipment, the Third Circuit held that the district court did not abuse its discretion when qualifying an expert whose relevant experience was limited to selling automotive and agricultural equipment, as well as teaching high school courses in automobile repair and maintenance. "At a minimum, however, 'a proffered expert witness must possess skill or knowledge greater than the average layman.'" *Bradley v. Amazon.com, Inc.,* No. 17-1587, 2023 WL 2574572, at *3 (E.D. Pa. Mar. 17, 2023) (quoting *Betterbox Commc'ns Ltd. v. BB Techs., Inc.,* 300 F.3d 325, 328 (3d Cir. 2002) (internal quotations, citations, and alterations omitted)).

"If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril,* 128 F.3d at 809 (citing *In re Paoli,* 35 F.3d at 741). "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Bradley,* 2023 WL 2574572 at *3 (quoting *Holbrook,* 80 F.3d at 782); *see also In re Paoli,* 35 F.3d at 741.

Here, Mr. Green is qualified to rebut Dr. Hanssens's expert report because he meets Federal Rule of Evidence 702's liberal requirements. Mr. Green is a financial consultant with over twenty years' experience valuing intellectual property, including trademarks. (Green Report at 2; *see also* Green Opp. Br. at 5). Although Dr. Hanssens's report applies econometrics methods—namely, multiple regression analysis—Mr. Green possesses enough econometrics knowledge to assist a jury. Specifically, Mr. Green has taken courses in econometrics and statistics while pursuing his various degrees and certifications. (Green Opp. Br. at 6). He has also worked with regression analyses in his professional work as a financial consultant, (*id.*), and has been retained as an expert

on numerous occasions to address the appropriate measure of damages resulting from intellectual property misappropriation, including for trademarks, (Green Report at 2). Given this experience, Mr. Green's qualifications to opine on this content appear to be greater than or equal to those of the engineering expert in *Hammond*, 691 F.2d at 652–53, who testified in a products liability action despite only having sales and high school teaching experience about automobile equipment and repairs. Additionally, Mr. Green clearly possesses more skill and knowledge than the average layman. The Court therefore finds Mr. Green sufficiently qualified to present his rebuttal opinion.

### ii.    Mr. Green's Opinions on Disgorgement Damages

For the same reasons it articulated above with regard to Dr. Hanssens (i.e., the issue going to the Court rather than the jury), the Court will deny Plaintiffs' motion to the extent it seeks to exclude Mr. Green's opinion on disgorgement damages.

### iii.    Mr. Green's Opinions on Compensatory Damages

Plaintiffs argue that Mr. Green's opinions on Plaintiff's lost profits are inadmissible because his analysis is unreliable, and because he raised irrelevant market factors when critiquing Dr. Hanssens's work. (Green Mov. Br. at 5 & 7). Defendant argues that Mr. Green need not conduct his own regression analyses because he is a rebuttal expert and can critique Dr. Hanssens's opinions; also, Mr. Green relied on his expertise and "analyzed and pointed to record evidence substantiating the importance of the variables omitted by Dr. Hanssens'[s] model." (Opp. Br. at 12).

The Court begins with the "reliability" and "fit" of Mr. Green's proposed testimony. As to the former, Plaintiffs contend that Mr. Green "did not apply any methodology" when critiquing Dr. Hanssens's work. (Green Mov. Br. at 5). The record reflects, however, that Mr. Green based that critique on his own expertise. "A judge can find an expert opinion reliable if it is based on

24

'good grounds' or methods and procedures of science rather than on subjective belief or unsupported speculation." *Williams*, 235 F. App'x at 928 (citing *Daubert,* 509 U.S. at 590). The Third Circuit has found that, in some circumstances, an expert's experience itself may provide an "adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it." *Oddi*, 234 F.3d at 158; *see also Bradley*, 2023 WL 2574572, at *8 ("an expert's own purported 'common sense' in an area of their expertise is necessarily informed by their own skill and knowledge in their field . . . The quality of [an expert's] review and the methods he employed in coming to his opinions can be probed on cross-examination."); *but see Oddi*, 234 F.3d at 158 (an expert's testimony was inadmissible because the expert "conducted no tests... and used little, if any, methodology beyond his own intuition."). Indeed, "[a] judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate," as the judge may believe that hearing the expert's testimony and assessing its flaws may help a jury to reach an accurate result. *In re Paoli* 35 F.3d at 744–45. Ultimately, "the trial court has 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *McGarrigle v. Mercury Marine*, 838 F. Supp. 2d 282, 290–91 (D.N.J. 2011) (first citing *Kumho Tire,* 526 U.S. at 152; and then citing *Viking Yacht Co. v. Composites One LLC,* 613 F.Supp.2d 626, 634 (D.N.J. 2009)).

The Court finds that Mr. Green's methods for addressing Dr. Hanssens's regression analysis are sufficiently reliable to survive exclusion. Although Plaintiffs claim Mr. Green did not apply *any* methodology, Defendant argues Mr. Green used his experience to identify missing explanatory variables and "methodological sleights of hand" in Dr. Hanssens's report. (Green Opp. Br. at 11). Defendant cites Fed. R. Civ. P. 26 and related case law to support its arguments

regarding Mr. Green's methods. For example, Defendant cites *Complaint of Borghese Lane, LLC*, No. 18-0533, 2023 WL 3114851, at *2 (W.D. Pa. Apr. 27, 2023) (collecting cases from other circuits), where an expert permissibly used his industry experience to review the movant's claims and "opine with respect to the substance and any deficiencies in [m]ovants' claim documentation/proofs." Likewise, Defendant cites *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-2445, 2020 WL 6887885, at *21 (E.D. Pa. Nov. 24, 2020), where the court found the testimony in question admissible though the expert did not "offer any independent scientific comparison[s]" but instead, "relie[d] on his statistical expertise to review and identify defects in the studies relied upon by Defendant's experts." This case is similar. Moreover, the Court notes that, while an "opinion must be more than mere speculation," "[a]n expert's conclusion may be drawn from a set of observations based on extensive and specialized experience." *Daiichi Pharm. Co., Ltd v. Apotex, Inc.*, No. 03-0937, 2005 WL 7979497, at *1 (D.N.J. Nov. 1, 2005) (first citing *Daubert*, 509 U.S. at 590; and then citing *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000)). "If it is determined that the expert's opinion has a reliable basis in the knowledge and experience of his discipline and is relevant to the matter before the court, the expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id.* (first citing *Daubert*, 509 U.S. at 592; and then citing *Kumho Tire*, 526 U.S. at 148).

Here, Mr. Green "rel[ied] on his financial and statistical expertise," and "pointed to record evidence substantiating the importance of the variables that Dr. Hanssens omitted in his damages model. (Green Opp. Br. at 12). Throughout his report, Mr. Green identified things that Dr. Hanssens "fail[ed] to consider" when conducting his analyses. (Green Report at 25 & 27). Defendants argue that Dr. Hanssens "admitted" that two variables Mr. Green identified that were

26

omitted from Dr. Hanssens's report "might make a difference," thereby strengthening their reliability argument. (Green Opp. Br. at 13). Plaintiffs respond by characterizing Mr. Green's opinions as exceeding mere critiques and instead raising "affirmative theories of causation"—that Plaintiff's lost profits were due to other market factors. (Reply Br. at 6). In so doing, Plaintiffs imply Mr. Green's opinions do not qualify as a rebuttal report, and that Mr. Green was required to support his "affirmative" opinions with a separate, reliable methodology. (*Id.*). Specifically, Plaintiffs cite *Bradley* as an example of where "a 'rebuttal' expert's alternative theories of causation are affirmative opinions that go beyond critiques of first expert's methodologies and conclusions." (Reply Br. at 4–5).

*Bradley*, however, is distinct. There, the court largely rested its holding on the fact the plaintiff had already disclosed multiple expert reports, yet the challenged report "[did] not appear to 'tie in'" with, and even appeared "contradictory to[,]" those prior reports, and instead attributed a "completely different cause" to the product malfunction at issue. *Bradley*, 2023 WL 2574572, at *13 (internal citation omitted). Moreover, the report failed to "contradict or rebut evidence on the same subject matter identified" in the defendant's expert report, and instead presented an alternative theory of causation. *Id.* at *14. Thus, it was stuck in an untenable posture of neither supporting the plaintiff's other experts' opinions nor truly rebutting the defendant's expert's determinations. *Id.* Here, however, Mr. Green has focused on Dr. Hanssens's conclusions— directly referencing Dr. Hanssens's report and engaging with the methodology therein, identifying several alternative variables that (based on his experience) Dr. Hanssens should have included in his regression analysis. *See Bradley v. Harrah's Atl. City Operating Co., LLC*, No. 21-10485, 2023 WL 5530495, at *4 (D.N.J. Feb. 27, 2023) (where additional pages in a plaintiff's expert report were rebuttal testimony when they directly referenced statements in defendant's expert

report and engaged with defendant's expert methodology.).  Properly characterized as a rebuttal to Dr. Hanssens's opinion, Mr. Green's opinion on Plaintiffs' lost profits has a sufficiently reliable methodology.  Moreover, as Mr. Green's rebuttal opinion addresses alleged shortcomings in Dr. Hanssens's compensatory damages analysis, that opinion "fits" in the context of this case.

The Court next turns to Plaintiffs' argument that it should exclude Mr. Green's critique of Dr. Hanssens's compensatory damages analysis on relevance grounds.  Specifically, Plaintiffs contend that Mr. Green's opinions on that subject are irrelevant, because Mr. Green has identified missing variables (i.e., market factors) that would not impact Dr. Hanssens's regression analysis or alter his conclusions.  (Green Mov. Br. at 7–8).  Defendant counters by claiming Plaintiffs "overstate the case," as Dr. Hanssens "admitted that two of the omitted variables might make a difference."  (Green Opp. Br. at 13).  Defendant emphasizes that Dr. Hanssens's disagreement with Mr. Green's conclusions does not warrant excluding those opinions, and that, "a[t] best, the supposed limitations of Mr. Green's critique go to the weight, not the admissibility of the critique." (*Id.*).

Defendant has the better argument here.  Mr. Green has identified multiple explanatory variables that *might* affect Dr. Hanssens's conclusions.  Pursuant to Rule 401, evidence is relevant if: (a) "it has any tendency to make a fact more or less probable than it would be without the evidence"; and (b) "the fact is of consequence in determining the action."  Third Circuit authority makes clear that "[t]he definition of relevant evidence is very broad." *Gibson*, 355 F.3d at 232. As noted herein, Dr. Hanssens issued a supplemental report to address certain of the variables Mr. Green identified, suggesting that certain of them have debatable importance.  In contrast, in *Pennsylvania State Univ. v. Vintage Brand, LLC*, 755 F. Supp. 3d 563 (M.D. Pa. 2024), for instance, the court found that evidence of a party's revenue and profits—wholly unrelated to any

allegedly trademark infringement—was irrelevant. Mr. Green's testimony provides "scientific knowledge *for purposes of the case.*" *Suboxone*, 2020 WL 6887885, at *3 (quoting *In re Paoli*, 35 F.3d at 743) (internal citation omitted). Thus, Mr. Green may testify and Plaintiffs may then cross-examine him at trial. As Dr. Hanssens and Mr. Green—two qualified experts—ultimately disagree on whether certain allegedly missing variables impacted Dr. Hanssens's lost profits analysis, the jury should ultimately determine whom they find to be more credible. The jury can then assign appropriate weight to the experts' opinions.

Based on the foregoing, the Court finds that it would be inappropriate to exclude Mr. Green's opinion on Plaintiff's alleged compensatory damages. The Court will not, therefore, address Defendant's Rule 403 argument. (Green Opp. Br. at 11–12).

### d.    Defendant's Motion to Exclude the Opinions and Testimony of Plaintiffs' Rebuttal Expert Vince Parry

Plaintiffs retained Vince Parry to rebut the expert opinions of Defendant's experts Mr. Michael Luby and Dr. Natalie Mizik, who "opined that corporate level branding does not impact sales and is not beneficial to pharmaceutical companies." (D.E. No. 270-2 at 1–54 (ECF Pagination) ("Parry Report")) ¶ 13). Specifically, Plaintiffs asked Mr. Parry "to describe the role that branding, particularly corporate branding, has on pharmaceutical companies" and "to assess whether corporate branding has an impact on the sales of pharmaceutical and other healthcare products." (*Id.*). Ultimately, Mr. Parry concluded that Defendant "has made and continues to make extensive use of the 'Merck' brand in the United States, as part of its global corporate rebranding strategy" and that "the benefits to [Defendant] of using the "Merck" brand in the United States are significant." (*Id.* ¶ 119). Mr. Parry based that opinion on "the internal [Defendant] documents [he] [had] reviewed and [his] knowledge of corporate branding in the pharmaceutical

industry[.]" (*Id.*). Regarding that "knowledge", the Court notes that Mr. Parry has thirty-five years of experience "as a corporate brander in the healthcare and pharmaceutical industry." (*Id.* ¶ 14).

Mr. Parry opined, in relevant part, as follows:

- "Corporate branding is important for pharmaceutical companies and helps drive sales and prescriptions."

- Defendant "has recognized the importance of corporate branding" and record evidence shows that Defendant "rebranded as 'Merck KGaA' in the United States in order to leverage the value of [Plaintiffs'] corporate branding"—including **(i)** by ███████████████████████████████████████████ ████ **(ii)** by "hir[ing] leading brand consultants to advise it on how to rebrand in the United States and around the world, resulting in the new 'Merck KGaA' brand"; **(iii)** by Defendant having its "rebranding strategy approved at the highest level, including the CEO and board of directors—like any corporate rebranding would be"; and **(iv)** by "execut[ing] and continu[ing] to execute its rebranding strategy in the United States, where it now uses the "Merck KGaA" brand extensively."

- Defendant's "rebranding has given the company a sophisticated visual branding toolbox which the company benefits from the Merck brand even without explicitly using the Merck name."

- "The expert reports of Mr. Luby and Dr. Mizik confuse branding with other aspects of marketing disciplines, which renders their conclusions about how branding works unreliable."

(*Id.* ¶¶ 16–118).

Mr. Parry further opined that "corporate branding is important for pharmaceutical companies and helps drive sales and prescriptions." (*Id.* at 7). He stated that "a brand is [] a name, term, design, symbol, experience, or other feature that distinguishes an organization or product from its rivals in the eyes of consumers." (*Id.* ¶ 16). Thus, corporate branding gives a unique impression to a consumer as soon as he or she sees or hears that company's name. (*Id.* ¶ 17). Mr. Parry also opined that because physicians "are under tremendous time constraints," they are "more likely to prescribe a drug from a well-known and trusted company than from an unknown company." (*Id.* ¶ 29). Moreover, Mr. Parry asserted that "[s]ales representatives from a major

30

brand like Merck are more likely 'to get in the door' than representatives from an unknown brand." (*Id.* ¶ 33). In addition, Mr. Parry claimed that physicians tend to get drug information at conferences where "pharmaceutical companies promote their corporate brand." (*Id.* ¶¶ 35–36). Mr. Parry concluded that Defendant "clearly understands" the importance of branding given their efforts to rebrand. (*Id.* ¶ 41).

Mr. Parry represented that his review of Defendant's internal rebranding documents, especially the presentation entitled, "Our Bold & Vital Future," illustrated to him that Defendant "understands the importance of an emotional connection between a corporate brand and its customers." (*Id.* ¶ 59). Mr. Parry opined that, ███████████████████████ ████████████████████████████████ ████████—Defendant decided to rebrand itself as "Merck" in the United States. (*Id.* ¶ 75). The rebrand takes the form of "Merck KGaA" and a "vibrant M symbol." (*Id.* ¶ 89).

Mr. Parry argued that Mr. Luby and Dr. Mizik "reduce the scope of their arguments to promotion only[,]" (*id.* ¶ 106), and that Dr. Mizik "falsely asserts that physicians are emotionless decision makers" and fails to mention that physicians are "a target of corporate branding," (*id.* ¶ 105–106). Mr. Parry further contended that Mr. Luby and Dr. Mizik incorrectly opined that pharmaceutical companies follow a house-of-brands model. In contrast, Mr. Parry represented that there "is variety in pharmaceutical brand architectures." (*Id.* ¶ 117).

Defendant argues that the Court should exclude Mr. Parry's testimony for two primary reasons: (i) his "conjecture about the impact of corporate branding on physician prescribing lacks any reliable basis" and "offers nothing more than speculation"; and (ii) his opinions regarding Defendant's intent "invade the fact-finding role of the jury." (D.E. No. 270 ("Parry Mov. Br.") at 1–2). Specifically, Defendant argues that Mr. Parry's opinions regarding the impact of corporate

branding on prescribing behavior are unreliable because they are (i) "untested and untestable[,]" (*id.* at 3–5); (ii) his "experience does not enable him to reliably opine on the effects of Defendant's alleged branding on physician prescribing[,]" (*id.* at 5–11); and (iii) he "does not apply his opinions to the [specific fertility and oncology] prescription drugs at issue in this case" and therefore his opinion cannot assist the jury in evaluating "Plaintiffs' claim that they suffered damages because Defendant's alleged branding caused physicians to prescribe more of Defendant's products and fewer of Plaintiffs' products[,]" (*id.* at 11–12). Defendant also argues that Mr. Parry "cannot substantiate his claim that a physician will prescribe more of a company's drugs simply because he or she likes the corporate brand" and "concedes that (i) he has not tested the effect of corporate branding on prescribing; (ii) he is unaware of any studies that quantify the effect; and (iii) any alleged effect cannot be quantified." (*Id.* at 1). Additionally, Defendant contends Mr. Parry's opinion invades the province of the jury because (i) he "improperly opines on Defendant's intent and state of mind"; and (ii) his "opinions regarding Defendant's rebranding efforts do not require specialized knowledge." (*See id.* at 12–15). Further, Defendant states Mr. Parry impermissibly attempts to "decipher the intent and meaning of Defendant's corporate documents, which jurors can read for themselves." (*Id.* at 2).

Plaintiffs argue that, to the contrary, Mr. Parry's opinions are not conjecture and are instead "based on decades of hands-on research and in-the-trenches experience applying the principles of corporate branding to major pharmaceutical companies." (D.E. No. 281 ("Parry Opp. Br.") at 2). Further, Plaintiffs contend that *Daubert* does not require an expert to quantify an effect in order to opine that there is an effect. (*Id.*). Plaintiffs also assert that Mr. Parry "does not opine on anyone's subjective intent[,]" but "[r]ather, as a branding expert, he interprets and explains jargon-heavy rebranding materials for a lay audience[.]" (*Id.* at 2–3). Plaintiffs contend that, at most,

Defendant's arguments are points they can use to cross-examine Mr. Parry at trial, but are not proper bases for exclusion. (*Id.* at 3). Plaintiffs also note that their damages expert, Dr. Dominique Hanssens, quantified the effects that Mr. Parry described based on his decades of industry experience in corporate branding. (*Id.*).

The Court begins with Defendant's challenges to the reliability of Mr. Parry's expert opinion. As the Court suggested during oral argument, Mr. Parry's situation is akin to that of Mr. Green. (OA Tr. at 106:24–107:7). Like Mr. Green, Mr. Parry has based his rebuttal opinion on his extensive industry experience, as well his review of certain relevant documents. The Court holds that Mr. Parry's opinions are therefore sufficiently reliable to withstand exclusion. Moreover, as Mr. Parry's rebuttal opinion addresses alleged shortcomings in Mr. Luby and Dr. Mizik's opinions on the impact of corporate branding, Mr. Parry's critique certainly "fits" in the context of this case. Defendant does not challenge Mr. Parry's qualifications. (OA Tr. at 101:12–15). The Court therefore, generally speaking, will permit Mr. Parry to testify. Defendant may then cross-examine him at trial. Privy to the full record, the jury will then determine which side's experts it finds to be more credible.

As the Court made clear at oral argument, however, it will not permit *any* expert to invade the province of the jury. (OA Tr. at 102:4–11 & 109:22–25). Relevant here, Defendant argues that the Court should preclude Mr. Parry from opining regarding its intent to use "Merck" as a brand name in the United States. (*See e.g.*, *id.* at 107:15–108:16). "It is well settled that experts may not provide testimony concerning 'the state of mind' or 'culpability' of defendants, corporations, regulatory agencies, and others." *Shire Viropharma Inc. v. CSL Behring LLC*, No. 17-0414, 2021 WL 1227097, at *5 (D. Del. Mar. 31, 2021) (quoting *Wolfe v. McNeil–PPC, Inc.*, 881 F. Supp. 2d 650, 661–62 (E.D. Pa. 2012)). "Expert witnesses are not 'permitted to testify . . .

regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred.'" *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006) (alterations in original) (quoting *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 443 (D. Del. 2004)); *see also Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 440–41 (D.N.J. 2009) (noting that "experts cannot opine on intent" and striking an expert's testimony "to the extent that it opines on the intent or state of mind of others" where the expert "purported to divine what [the defendants] w[ere] 'trying' to do with [their] marketing strategy and what it believed was right or wrong" (citations omitted)). Indeed, the question of intent constitutes a 'classic jury question and not one for experts.'" *In re Suboxone*, 2020 WL 6887885, at *10–12 (quoting *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004)); *see also Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.*, No. 05-1887, 2009 WL 3754170, at *8 (D.N.J. Nov. 5, 2009) (concluding that an expert would "be permitted to testify with respect to the underlying facts regarding the prosecution of the '445 and '937 patent applications," but that he "w[ould] not be permitted to address the mental states of the patentees" and likewise he would "not [be] permitted to draw inferences from the underlying facts or opine with respect to the intent of such parties in presenting these applications"). The Court will therefore preclude Mr. Parry from offering any opinions regarding Defendant's subjective intent or state of mind—either generally or regarding particular communications or other documents.

Finally, the Court will address Defendant's argument regarding Mr. Parry's potential testimony about Defendant's internal documents. "An expert may testify to a review of internal documents for the purpose of explaining the basis for his or her admissible opinions . . . [b]ut simply parroting [a d]efendant's corporate documents or offering a narrative account of events from them will not be helpful to the jury." *O'Bryant v. Johnson & Johnson*, No. 20-2361, 2022

34

WL 7670296, at *13 (D.N.J. Oct. 13, 2022) (alterations in original) (citations omitted); *see also Arevalo v. Coloplast Corp.*, No. 19-3577, 2020 WL 3958505, at *21 (N.D. Fla. July 7, 2020) (Finding that expert testimony on internal documents would be "limited to explaining technical terminology, drawing inferences that would not be apparent to the lay person, and explaining the basis of admissible opinions through commentary on documents and exhibits in evidence."). For example, in the *O'Bryant* case, the court excluded expert testimony "to the extent [the expert's] opinions simply rehash internal corporate documents," reasoning that "those opinions are not properly the subject of expert testimony because they are lay matters" and instead, "[s]uch testimony is properly presented through fact witnesses and documentary evidence." *O'Bryant*, 2022 WL 7670296, at *13. The court noted, however, that the expert could "of course, rely on [d]efendants' documents to support otherwise admissible expert testimony." *Id.* Hence, the Court will permit Mr. Parry to opine as to his expert interpretation of Defendant's documents related to its rebranding efforts to the extent that it is relevant, would be helpful to the jury, and is based on his extensive experience as a healthcare branding expert. Defendant will then be free to cross-examine Mr. Parry at trial. To be clear, however, Mr. Parry cannot simply read selective portions of Defendant's documents to the jury, if the jury can read and understand those documents for themselves without any specialized knowledge. In other words, Mr. Parry "may not merely parrot corporate documents but may, of course, rely on Defendant['s] documents to support otherwise admissible expert testimony." *O'Bryant*, 2022 WL 7670296 at *13. Nor, as noted above, may Mr. Parry testify regarding Defendant's subjective intent concerning those documents—either with regard to branding, generally, or with respect to any specific documents.

Defendant's motion to exclude Mr. Parry's expert opinions is therefore **GRANTED-IN-PART** and **DENIED-IN-PART** as described herein.

e.     **Plaintiffs' Motion to Exclude Testimony from Defendant's Expert Joel Steckel**

Defendant retained marketing expert Dr. Joel Steckel to (i) "assess the reliability and validity of [Plaintiffs' expert] Dr. [Jerry] Wind's social media study of 'potential confusion' associated with the term 'Merck'"; (ii) "to evaluate how [Dr. Wind] assessed trademarks and corporate/firm names"; and (iii) "to evaluate [Dr. Wind's] discussion of 'actual confusion' from emails, call logs, and online articles." (*See* D.E. No. 278-1 at 29–63 (ECF pagination) ("Steckel Report")) ¶ 22). To assess Dr. Wind's social media analysis, Dr. Steckel reviewed Dr. Wind's "population definition, exclusion methods, calculations, and coding for 'potential confusion'" and "made several corrections of what [he] felt were the most obvious errors in [Dr. Wind's] approach using additional data from Crimson Hexagon, the social media data provider Dr. Wind had used for his study." (*Id.* ¶ 23). Dr. Steckel also "designed, conducted, and analyzed a consumer survey to determine whether potential consumers of [Defendant's] products perceive the phrase 'Merck KGaA, Darmstadt, Germany' used in public facing [Defendant] materials (e.g., a LinkedIn page) to be a trademark or a corporate/firm name." (*Id.* ¶ 24). Dr. Steckel represented he conducted his "consumer survey in a manner consistent with the scientific standards of [his] profession." (*Id.* ¶ 25). He further stated that the objective for his survey "was simply to find out whether consumers interpreted the phrase 'Merck KGaA, Darmstadt, Germany' as a trademark or as a corporate/firm name on [Defendant's] LinkedIn page[,]" which he selected because Dr. Wind asserted Defendant was using "Merck KGaA, Darmstadt, Germany" as a trademark on its LinkedIn page. (*Id.* ¶ 78 (the "Main Survey")). Dr. Steckel also conducted a benchmark survey (the "Benchmark Survey") for comparison that "employed a stimulus identical to the [Main Survey] in all aspects except that [he] removed the at-issue phrase (i.e., the phrase 'Merck KGaA, Darmstadt, Germany' was replaced with the phrase 'EMD - An Affiliate of Merck KGaA, Darmstadt, Germany')"; "replaced

36

Case 2:16-cv-00266-ES-MAH    Document 302 *SEALED*    Filed 11/12/25    Page 37 of 60 PageID: 13612

'Merck KGaA, Darmst…' and 'Merck KGaA, Darmstadt, Ge…' with 'EMD' in the 'Jobs' box";
and "removed the tiny-font references to 'Merck KGaA, Darmstadt, Germany' from the
'Overview' and 'Life' boxes." (*Id.* ¶ 79).

Dr. Steckel represents that he conducted his surveys as follows:

- Dr. Steckel first screened potential respondents to ensure they were medical or related professionals who make purchasing decisions or prescribing decisions regarding the products Defendant sells. (Steckel Report ¶ 80).

- Next, because this audience may not necessarily be familiar with the concepts of "trademark" and "corporate/firm name", including the distinctions between them, (D.E. No. 278-1 at 1–27 (ECF pagination) ("Steckel Decl.") ¶ 15), Dr. Steckel provided them with a "mini-course" (i.e., definitions for those concepts) "to educate them about the difference in these two categories" and then a "mini-test" (i.e., an example task wherein respondents must apply the definitions from the mini-course) "to test their ability to comprehend this distinction." (*Id.*; *see also* Dr. Steckel Report ¶ 95). Here, Dr. Steckel employed a mini-test wherein "respondents were asked to view an image of a portion of a news article featuring the phrase "Ford Motor Company", as well as an image of a Ford truck and asked to characterize each example as depicting the use of either a trademark or brand. (Steckel Report ¶ 95(b)). "Respondents who incorrectly answered either of these questions were screened out" and prohibited from further participation in the survey. (*Id.*).

- Respondents who passed the "mini-test" were then shown an screenshot image of Defendant's LinkedIn page featuring the phrase "Merck KGaA, Darmstadt, Germany." (*Id.* ¶ 95(c) & (d)). The survey then asked the respondents: "Based on the LinkedIn page you just reviewed, which of the following best describes how the phrase 'Merck KGaA, Darmstadt, Germany' is used on this webpage?" (*Id.* ¶ 95(e)). Respondents were then required to select one of the following options:

    o "A corporate name or firm name that reflects a company's registered legal name"

    o "A trademark or words, names, phrases, design elements, images, graphics, logos, or a combination of these that uniquely identifies one seller's product to consumers in the marketplace," or

    o "Unsure / No opinion." (*Id.*).

- As noted above, Dr. Steckel also conducted Benchmark Survey in which respondents were shown the same LinkedIn screenshot, with minor variations (e.g., replacing the phrase "Merck KGaA, Darmstadt, Germany" with the phrase "EMD - An Affiliate of Merck KGaA, Darmstadt, Germany"). (*Id.* ¶ 99).

Interpreting the results of the Main Survey, Dr. Steckel found "that consumers exposed to the standalone phrase 'Merck KGaA, Darmstadt, Germany' were more likely to perceive the phrase as it appears on [Defendant's] LinkedIn page to be a corporate/firm name" as opposed to a trademark/brand and, specifically, "80.7 percent of respondents view 'Merck KGaA, Darmstadt, Germany' to be a corporate/firm name on [Defendant's] LinkedIn page." (*Id.* ¶¶ 97 & 100). In comparison, the results of the Benchmark Survey showed that 68.8% of respondents viewed "EMD – An Affiliate of Merck KGaA, Darmstadt, Germany" as a "corporate/firm name." (*Id.* ¶ 101).

Dr. Steckel offered several conclusions in his expert report, most of which involved critiques of Plaintiffs' expert Dr. Jerry Wind's opinions. (*Id.* ¶ 102). Plaintiffs do not seek to exclude those conclusions, and the Court will not address them here. Plaintiffs do take issue with Dr. Steckel's final conclusion: "My survey demonstrates that the vast majority of the target audience (e.g., relevant medical specialists) perceive 'Merck KGaA, Darmstadt, Germany' — which Dr. Wind asserts is used as a trademark — as a corporate/firm name and not as a trademark." (*Id.*). Plaintiffs ask the Court to bar Dr. Steckel from testifying regarding about the results of his consumer perception survey. (*See generally* D.E. No. 273 ("Steckel Mov. Br.")).

Plaintiffs argue that Dr. Steckel's "survey design introduced bias at multiple points to infect the results," rendering his survey untrustworthy, unreliable, and inadmissible." (*Id.* at 1; *see generally id.*; D.E. No. 290 ("Steckel Reply Br.")). Specifically, Plaintiffs argue that "Dr. Steckel's survey design collected consumer opinions on a matter that requires specialized knowledge that they do not have"—and that this alone renders it inadmissible under Federal Rule of Evidence 701. (Steckel Mov. Br. at 1). But even if this issue was appropriate for a consumer survey, Plaintiffs argue, Dr. Steckel skewed his survey design in favor of Defendant's preferred outcome by, *inter alia*, screening out respondents who did not agree with his view of the distinction

38

between a "corporate/firm name" and a "trademark." (*Id.* at 1–3).

Plaintiffs contend that the Court should exclude Dr. Steckel's opinion testimony and evidence related to his flawed consumer perception survey for four primary reasons. ***First***, Plaintiffs argue "Dr. Steckel's survey did not measure consumer 'perception,' but only tested respondents' ability to absorb and adhere to Dr. Steckel's views"—specifically, his view of the definitions of the legal terms "trademark" and "corporate/firm name." (*Id.* at 8–11). Moreover, the respondents, who consisted of medical and lab consumers, are not versed on the legal distinctions between the two terms and are not qualified to opine on them. (*Id.*).

***Second***, Plaintiffs assert Dr. Steckel's screening questions involving the Ford logo were "biased and limited the population sample to those who gave his predetermined 'right' answers," which led to skewed and unreliable results. (*Id.* at 11–13).

***Third***, Plaintiffs argue Dr. Steckel's flawed survey design inappropriately drove respondents to identify the screenshot of Defendant's LinkedIn page as a "corporate/firm name" rather than a trademark or brand. (*Id.* at 13–14). Plaintiffs state that Dr. Steckel both (i) pre-conditioned respondents (i.e., with the Ford screening questions) to associate screenshots such as that of Defendant's LinkedIn page as a "corporate/firm name" and to associate marks on physical products as a "trademark" in comparison; and (ii) only gave respondents the limited options of "trademark," "corporate/firm name," or nothing at all, which was leading and led to biased and invalid results. (*Id.* at 14).

***Fourth***, Plaintiffs contend Dr. Steckel's survey design skewed the results regarding Defendant's LinkedIn page, which renders the survey results unreliable, and further that had the respondents "not been primed to provide Dr. Steckel's preferred response – or screened out altogether[,]" it is possible respondents could have viewed Defendant's LinkedIn page differently.

(*Id.* at 15).

In response, Defendant argues that: (i) Dr. Steckel used a reliable, widely accepted survey methodology—specifically, the *Teflon* survey methodology; (ii) Dr. Steckel used appropriate non-leading, closed-ended questions; (iii) Dr. Steckel's Benchmark Survey ensured the Main Survey's reliability; and (iv) Plaintiffs' arguments—even if valid—do not warrant excluding Dr. Steckel's opinions. (*See generally* D.E. No. 278 ("Steckel Opp. Br.")). Defendant further notes that Plaintiffs do not challenge Dr. Steckel's qualifications or the relevance of his opinions and instead only object to certain aspects of his survey design and, in turn, the reliability of his survey-based opinion. (*Id.* at 6).

More specifically, Defendant asserts that "[t]he purpose of Dr. Steckel's survey was to establish consumers' perception of a specific phrase in context as trademark use, or not." (*Id.*). Defendant contends that Dr. Steckel modeled his survey after commonly accepted survey methodologies—specifically, the *Teflon* survey or mini-course/mini-test survey format, which courts have admitted in a variety of contexts. (*Id.* at 7–8 (collecting cases)). In addition, Defendant states that it used Plaintiffs' expert's definitions for "trademark" and "corporate/firm name." (*Id.* at 9–10). Defendant also contends that the high percentage of potential respondents who were screened out shows the importance of the mini-test and does not reflect bias but, rather, provides another reason as to why Dr. Steckel's results are trustworthy. (*Id.* at 10).

Further, addressing Plaintiffs' argument that Dr. Steckel did not use open-ended questions for the survey, Defendant contends that Plaintiffs ignore the third "unsure/no opinion" option he provided to survey respondents, and that even if Plaintiffs' arguments regarding closed-ended questions had merit, those criticisms go to the weight of Dr. Steckel's testimony, and not its admissibility. (*Id.* at 11–13).

Additionally, Defendant contends Dr. Steckel's Benchmark Survey confirmed the Main Survey's reliability because it showed the respondents the same type of stimulus, i.e., a screen shot of a LinkedIn webpage, but provided different results, and "[t]he fact that [the] results were so different demonstrates that Dr. Steckel's conclusions from his Main Survey were not driven by any 'pre-conditioning' effects as Plaintiffs allege." (*Id.* at 14 (citing Steckel Decl. ¶ 33)).

Finally, Defendant asserts that in the Third Circuit, technical issues with a survey typically go to only to its evidentiary weight, rather than its admissibility, and Plaintiffs have not raised any issues with Dr. Steckel's consumer perception survey, either alone or in combination, so substantial as to render the survey's conclusions unreliable. (*Id.* at 14–15).

"Survey evidence is generally admissible in cases alleging trademark infringement under the Lanham Act." *PNC Fin. Servs. Grp., Inc. v. Plaid Inc.*, No. 20-1977, 2024 WL 3691607, at *4 (W.D. Pa. Aug. 7, 2024) (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007)); *see also Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. 11-3684, 2016 WL 3545529, at *4 (D.N.J. June 29, 2016) ("Survey evidence is routinely used in trademark infringement cases . . . '[A]s long as [it is] conducted according to accepted principles . . . survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value.'" (citations omitted)); *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 368 (D.N.J. 2002) ("Survey evidence has been allowed in trademark cases. Its admissibility is dependent upon the qualification of the witness, the helpfulness of the testimony to the trier of fact, and the reliability and fit of the testimony." (citations omitted)).

Courts consider a number of factors when evaluating the admissibility of survey evidence,

including whether:

1. The universe was properly chosen and defined;

2. The sample chosen was representative of that universe;

3. The questions asked of the interviewees were framed in a clear, precise and nonleading manner;

4. Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted;

5. The data gathered were accurately reported;

6. The data were analyzed in accordance with accepted statistical principles; and

7. Objectivity of the entire process was assured.

*PNC Fin. Servs. Grp., Inc.*, 2024 WL 3691607, at *4 (quoting *Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, No. 01-1524, 2003 WL 24010950, at *3 (W.D. Pa. Apr. 23, 2003), *aff'd sub nom. Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004)). Moreover, "methodological deficiencies in a survey generally relate to the weight given the survey's conclusions rather than to its admissibility." *J & J Snack Foods, Corp.*, 220 F. Supp. 2d at 369. However, a court should exclude a survey from evidence "when the deficiencies are so substantial that they render the survey's conclusions untrustworthy." *Id.* (citations omitted)). Put another way, "where the survey is so misleading that it cannot assist the trier of fact, it is inadmissible, even when that failure is due to its methodology." *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 291 (S.D.N.Y. 2022), *aff'd sub nom. Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024) (citing *Universal City Studios, Inc.*, 746 F.2d at 118 (2d Cir. 1984) (excluding survey in trademark infringement action due to leading questions)). This is so because "[s]ignificant methodological deficiencies lessen the survey's probative value so that its probative value is substantially outweighed by the prejudice, waste of time, and confusion that it

would cause at trial." *J & J Snack Foods, Corp.*, 220 F. Supp. 2d at 369 (citations omitted).

Here, the Court finds that Dr. Steckel's consumer perception survey was so methodologically flawed that its results are unreliable and, in turn, inadmissible. The Court will, therefore, bar Defendant from offering any testimony or other evidence concerning that survey at trial. First, and most critically, one of Dr. Steckel's "screener" questions fatally tainted his survey sample. That question asked respondents to indicate whether "Ford Motor Company" was a "corporate or firm name that reflects a company's registered legal name" or "a trademark." (Steckel Report ¶ 95). As both sides acknowledged in their briefing, "Ford Motor Company" is a registered trademark. (Steckel Mov. Br. at 12; Dr. Steckel Opp. Br. at 9, n.7). Though it does not appear either party addressed the issue directly, the Court will assume that "Ford Motor Company" is also the entity's "registered legal name." Dr. Steckel, however, determined that the sole "correct" answer to this screener question was "corporate or firm name that reflects a company's registered legal name." (Steckel Report ¶ 95(b)). Dr. Steckel thus excluded any respondents who identified "Ford Motor Company" as a "trademark" from participating in the Main Survey. (*Id.*). Dr. Steckel did so "to ensure only respondents who understood the definitions [he provided in the mini-course] were asked [to participate further]." (*Id.*). Here, however, Dr. Steckel utilized a screening question that misapplied the very definitions he was trying to test, as "Ford Motor Company" qualifies as *both* a "corporate name" and "trademark" under those definitions. Thus, it appears that every person whom Dr. Steckel excluded from the Main Study based on their response to that question actually answered it correctly—both from a practical perspective (i.e., "Ford Motor Company" is, indeed, a registered trademark) and based on the definition that Dr. Steckel provided in his mini-course ("Ford Motor Company" can clearly be a trademark under that definition).

While Defendant argues that the context of the screener example (i.e., a snippet of a news

article) made "company name" a more accurate answer than "trademark," (Steckel Opp. Br. at 9, n.7), both answers were technically correct based on the definitions Dr. Steckel was testing. This, the Court suspects, is an inherent problem in utilizing a screening example that fits both definitions. By permitting only those respondents who utilized his "preferred" definition to participate in the Main Survey, Dr. Steckel introduced bias into his sample.[4] This bias has the potential to be significant: Dr. Steckel excluded 104 potential respondents from the Main Survey based on their responses to this screener question, (D.E. No. 273-2), leaving only the 331 respondents who answered "correctly," (Steckel Report ¶ 98). This is not a situation where Dr. Steckel or another expert can measure that impact retroactively by adding or removing variables from a statistical analysis. For the respondents Dr. Steckel excluded from the Main Survey, their input was never collected, and is now simply lost. Nor does the Court find that a rigorous cross-examination would be sufficient to address this issue. Under these circumstances, the Court holds that the results of Dr. Steckel's consumer perception survey are unreliable,[5] and will therefore exclude testimony and other evidence regarding that survey under Federal Rule of Evidence 702.

While the Court may exclude the consumer perception survey without further analysis, it observes a number of other significant issues. First, it is not clear that the survey results would be helpful to a jury. Though ostensibly meant to gauge how medical professionals would characterize certain content on Defendant's LinkedIn page, Dr. Steckel acknowledged that those individuals would "not necessarily [have] . . . common knowledge" of "the difference between a trademark and a corporate name." (Steckel Decl. ¶ 15). He therefore primed the respondents with a "mini-

---

[4] In making this determination, the Court does not suggest that Dr. Steckel did so purposefully, or with any ill intentions.

[5] The Court understands that Dr. Steckel used the same "screener" question for both the Main Survey and the Benchmark Survey, thereby tainting both studies. (Steckel Report ¶ 95, n.121).

44

course" on those concepts before exposing them to the test stimuli. (Steckel Report ¶ 81). As the respondents would not have the benefit of Dr. Steckel's mini-course when encountering Defendant's LinkedIn page "in the wild," so to speak, it is unclear whether Dr. Steckel's survey measured the respondents' inherent opinions on the test stimuli or simply some learning effect associated with the mini-course.

Moreover, permitting Dr. Steckel to introduce evidence regarding his survey would implicitly involve injecting his specific legal definition for the term "trademark" into the case. Though Federal Rule of Evidence 704 "allows experts to provide an opinion about the 'ultimate issue' in a case, it prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards." *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013) (citing *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir.2006); *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir.1991)). Indeed, "expert testimony becomes impermissible if the expert's opinion would interfere with the district court's 'pivotal role in explaining the law to the jury.'" *Id.* (quoting *Berckeley Inv. Grp.*, 455 F.3d at 217). Here, Dr. Steckel plans to testify about the percentage of survey participants who considered a reference on Defendant's LinkedIn page to be a "corporate name" as opposed to a "trademark." As noted herein, however, Dr. Steckel did not ask the respondents for their opinions in a vacuum but, rather, based on their application of a specific definition of "trademark" that Dr. Steckel provided in a mini-course. Thus, the survey results are only relevant in this case if the Court permits Dr. Steckel to supply the legal conclusion as to the composition of a "trademark." This is not permissible. *See, e.g., vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 449 (D.S.C. 2019) (prohibiting use of a survey that incorporated a definition for the term "trademark" on the grounds that (i) it asked the Court "to permit an expert to make the legal conclusion of what constitutes a trademark"; and (ii) provided "overly narrow"

45

definition for that term).

For these reasons, the Court will **GRANT** Plaintiffs' motion to exclude any testimony or other evidence concerning Dr. Steckel's consumer perception survey.[6] The Court notes that, in excluding evidence regarding that survey, it makes no findings regarding the admissibility of Dr. Steckel's other opinions.

### f. Defendant's Motion to Exclude the Opinions and Testimony of Plaintiffs' Expert Yoram "Jerry" Wind

Plaintiffs retained Dr. Yoram "Jerry" Wind to analyze Defendant's branding in the United States and to determine whether Defendant is impermissibly using the "Merck" name as a brand or a trademark—rather than as a "corporate name" in accordance with the parties' contract. (D.E. No. 283 ("Wind Opp. Br.") at 1; *see also* D.E. No. 283-2 ("Wind Report")). Specifically, Plaintiffs asked Dr. Wind to do the following five things: (i) "[e]xplain how companies build valuable brands and how they use corporate names, firm names, brands, trademarks, and logos"; (ii) "[e]xplain the importance of branding in the pharmaceutical industry"; (iii) "[a]nalyze the value of the (i) Merck, (ii) KGaA, and (iii) EMD brands"; (iv) analyze how Defendant "has branded itself in the United States to determine whether [it] has used the Merck name as a brand name, trademark, or logo, as opposed to a firm name or corporate name"; and (v) "[a]nalyze social media posts and other data to determine if consumers and other stakeholders are confused or likely to be confused by [Defendant's] use of 'Merck' in the United States." (Wind Report ¶ 11). Dr. Wind described his "objective" as opining on Defendant's "U.S. rebranding initiative and whether this effort is likely to deceive consumers."[7] (*Id.* ¶ 1). In pursuing that goal, Dr. Wind analyzed "the relevant

---

[6] Considering the Court's holdings herein, it need not address the parties' other arguments regarding Dr. Steckel's consumer perception survey.

[7] Dr. Wind noted that in 2015, Defendant "made the decision to rebrand its U.S. business from 'EMD Group' to 'Merck KGaA, Darmstadt, Germany'" and that "[p]rior to this rebranding effort, in the United States, [Defendant] used the 'EMD' brand, which did not expressly make use of 'Merck' in its name." (Wind Report ¶ 8). He further noted that he understands that Defendant "changed its legal name from E. Merck Darmstadt Germany to Merck KGaA

marketing literature and practice," Defendant's "internal marketing and business documents, data on publicly available brand rankings, [Defendant's] marketing initiatives, an analysis of posts on various major social networks, an analysis of consumer contact with Merck and [Defendant], and media coverage of [Defendant]." (*Id.* ¶ 2).

Dr. Wind made the following "key findings and opinions":

1. "Merck is a famous and well recognized brand in the U.S. whereas neither EMD nor 'Merck KGaA Darmstadt Germany' are known or valuable brands;"

2. "A strong brand is important for all companies and especially those in the pharmaceutical industry;"

3. Defendant's internal documents show that it "intentionally rebranded itself as 'Merck' to capitalize on [Plaintiffs'] reputation and thus enhance its U.S. positioning and brand equity;"

4. Defendant "executed on its plan to rebrand itself in the U.S. as 'Merck KGaA, Darmstadt, Germany';"

5. "Analyzing the posts of individuals, organizations, and news aggregators on social networks before versus after [Defendant's] rebranding efforts shows initial evidence that the rebranding has led to a significantly higher level of potential confusion, *i.e.*, in third parties' use of 'Merck' to describe [Defendant's] products, activities, and events;"

6. "Evidence from a variety of sources including consumer contacts with [Plaintiffs] and [Defendant] as well as from media reports show actual confusion between [Plaintiffs] and [Defendant];"

7. "Negative publicity about [Defendant] is likely to be incorrectly attributed to Merck and thus impact negatively its brand image and equity;"

8. "The findings of all my analyses show a consistent pattern. The rebranding of [Defendant] is likely to lead to confusion with [Plaintiffs] and thus benefit [Defendant] from its positive association with [Plaintiffs'] brand equity and positioning;" and

9. "At the same time [Plaintiffs] bear[] a risk of having any negative publicity about [Defendant] attributed to it."

---

Darmstadt Germany in 1995, but at the time, continued to use the EMD branding, and did not undertake the significant rebranding transition to 'Merck KGaA Darmstadt Germany' until 2015" and that "[t]his rebranding forms part of the basis for this lawsuit." (*Id.* (citing Defendant's Answer, D.E. No. 8, at 3–4)).

(Wind Report ¶ 3). Defendant argues that most of Dr. Wind's "key findings" are unreliable, and that the Court should therefore exclude them in accordance with Federal Rule of Evidence 702. (D.E. No. 272 ("Wind Mov. Br.") at 1–15).[8] Plaintiffs oppose each point and contend, generally, that "[a]t most, [Defendant's] arguments go to the weight of Dr. Wind's testimony rather than its admissibility." (Wind Opp. Br. at 3). The Court will address the parties' arguments regarding each challenged "key finding" in turn.

i.      **Key Finding 1**

With regard to Dr. Wind's conclusion that "Merck is a famous and well recognized brand in the U.S. whereas neither EMD nor 'Merck KGaA Darmstadt Germany' are known or valuable brands" ("Key Finding 1"), (Wind Report ¶ 3), Defendant argues that this opinion is inadmissible because Dr. Wind supported it with rankings by third-party magazines and websites without analyzing those sources' underlying methodologies. (Wind Mov. Br. at 1–3). Defendant further contends that Dr. Wind "cherry-picked" a few of its internal documents to demonstrate that it believed its brands lacked value in the United States, while ignoring contrary evidence, (*id.* at 3), and argues that Dr. Wind simply summarized documents without providing any additional analysis, which is not helpful for the jury. (*Id.*)

In their opposition, Plaintiffs contend that Dr. Wind properly referenced and relied on third-party scholarly magazines and websites, including InterBrand, which experts may reasonably rely upon (and regularly do) when opining on pharmaceutical branding. (Wind Opp. Br. at 4–5). Plaintiffs argue, for instance, that courts have specifically relied on InterBrand in prior trademark cases and, moreover, that "[t]here is no need for an expert to 'go beyond' scholarly articles and brand rankings to check the underlying work." (*Id.* (citing cases)). Plaintiffs further argue that

---

[8]      Defendant does not argue that Dr. Wind is unqualified to offer expert testimony. (OA Tr. at 132:14–22).

Dr. Wind's use of Defendant's internal documents would be helpful to a jury, as he does not simply read them but rather "analyzes and interprets those complex technical documents and puts them into context" as a branding and marketing expert with years of experience. (*Id.* at 5).

The Court begins with Dr. Wind's reliance on third party work product. "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (citing Fed. R. Evid. 701, 702, & 703). In fact, "[e]xpert testimony that relies upon reports or data generated by others is routinely admissible." *Campmor, Inc. v. Brulant, LLC*, No. 09-5465, 2013 WL 1750009, at *3 (D.N.J. Apr. 23, 2013) (citing cases); *see also Am. Airlines, Inc. v. Delta Air Lines, Inc.*, No. 19-1053, 2021 WL 3629735, at *7 (N.D. Tex. May 18, 2021) ("[R]eliance on third parties for information is not a basis for exclusion of expert opinion evidence." (citing Fed. R. Evid. 703)). These holdings reflect that "[t]rained experts commonly extrapolate from existing data." *Campmor, Inc.*, 2013 WL 1750009, at *3 (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997)).

Indeed, "[w]hile experts may not simply 'parrot' ideas of other experts, they 'are permitted to rely on materials used by other experts in developing their own opinions.'" *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014) (quoting *I.B.E.W. Loc. Union 380 Pension Fund v. Buck Consultants*, No. 03-4932, 2008 WL 2265269, at *3 (E.D. Pa. June 3, 2008)). "Experts may use a mix of objective data and subjective analysis from another expert to create an admissible report, and the testifying expert's knowledge regarding the underlying facts goes to the weight accorded to that expert's report and testimony, rather than its admissibility." *Id.* (citation modified) (quoting *I.B.E.W. Loc. Union 380 Pension Fund*, 2008 WL 2265269, at *3). For example, in addressing a challenge to Dr. Wind's opinions in another case, the court found that Dr. Wind's non-survey opinions were admissible, noting there was "no evidence to suggest this

third-party data is unreliable, and there is no large gap between that data and Dr. Wind's expert opinions offered in his report" and further stating that "the Court would be hard-pressed to find an expert report that did not, to some extent, rely on any information or methods previously developed by others." *Am. Airlines, Inc. v. Delta Air Lines, Inc.*, No. 19-1053, 2021 WL 3629735, at *7 (N.D. Tex. May 18, 2021).

Under Federal Rule of Evidence 703, "experts may rely on facts from firsthand knowledge or observation, information learned at the hearing or trial, and facts learned out of court." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (citing Fed. R. Evid. 703). "If the facts are of the type 'reasonably relied upon' by experts in the particular field in forming opinions or inferences upon a subject, the facts or data need not be independently admissible in evidence." *Id.* (citations omitted). While "[i]t is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record," Federal Rule of Evidence 705 "provides for the disclosure of facts underlying the expert's opinion." *Id.* (citing Fed. R. Evid. 705). "Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination." *Id.* (citing cases). "[D]isagreement with the . . . methodology and the underlying assumptions" an expert makes "goes to the weight given to his [or her] testimony, rather than admissibility." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 391 (3d Cir. 2016); *see also Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, No. 13-0324, 2017 WL 3528606, at *6–7 (D. Del. Aug. 16, 2017) ("Contradiction is proper fodder for cross-examination." (citing *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004))).

The Court recognizes that there are, of course "instances where the data underlying the expert's opinion is 'so unreliable that no reasonable expert could base an opinion on them' and

'the opinion resting on that data must be excluded.'" *Campmor, Inc.*, 2013 WL 1750009, at *3 (first quoting *In re TMI Litig.*, 193 F.3d at 697; and then citing *id.* (holding that district court properly excluded expert testimony where the sole basis for the testimony was health summaries prepared by "employees of Trial Plaintiffs' counsel"); *In re Paoli*, 35 F.3d at 762 (expert testimony properly excluded "where [physicians] based their conclusion as to a plaintiff's symptoms solely on the plaintiff's self-report of illness in preparation for litigation"); *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448–49 (3d Cir. 2003) (affirming exclusion of expert who relied upon documents despite not knowing who created them or the information contained therein, and who also relied upon a sampling of audit tapes that were selected by the defendant's attorney)). From these examples, it seems clear that experts may not rely on underlying data of unknown or dubious provenance.

The Court is satisfied that the brand ranking data Dr. Wind used as a basis for Key Finding 1 is "of the type 'reasonably relied upon' by experts" in his field. *Stecyk*, 295 F.3d at 414. For instance, Defendant's expert, Dr. Steckel, testified that he has seen InterBrand data cited in academic research. (D.E. No. 283–1 at 303:1–22). Defendant does not suggest otherwise, and instead argues that any opinions based on that data are unreliable, as Dr. Wind did not have a sufficient understanding of the methodology used to generate it. (Wind. Mov. Br. at 1–3). Critically, however, Defendant has not identified anything in the record suggesting that the underlying brand ranking data is so unreliable that no reasonable expert would base an opinion upon it. *Campmor, Inc.*, 2013 WL 1750009, at *3. Thus, while Dr. Wind may not simply "parrot" the underlying data to a jury, he may certainly incorporate it into his testimony and explain how it supports his opinion. Defendant will, of course, be free to cross-examine Dr. Wind regarding his understanding of the data and the methodology used to generate it, if appropriate.

Turning to Dr. Wind's reliance on Defendant's internal documents, the Court reaches the same conclusion as it did with regard to Mr. Parry. Thus, Dr. Wind "may not merely parrot corporate documents but may, of course, rely on Defendant['s] documents to support otherwise admissible expert testimony." *O'Bryant*, 2022 WL 7670296 at *13. To the extent Defendant believes that Dr. Wind "cherry picked" certain documents while ignoring others, it is free to explore that issue on cross examination.

### ii.    Key Finding 2

As to Dr. Wind's opinion that "[a] strong brand is important for all companies and especially those in the pharmaceutical industry" ("Key Finding 2") (Wind Report ¶ 3), Defendant argues that Dr. Wind failed to provide any reliable methodology or analysis in support of that conclusion. (Wind Mov. Br. at 3–4). Defendant further contends that Dr. Wind's "broad conclusory opinions about brand strength in the pharmaceutical industry" are both irrelevant ("because they are not specific to fertility and oncology medications, the only two areas in which the parties actually compete") and would not assist the jury, and thus should be excluded. (*Id.*). It does not appear that Plaintiffs addressed these arguments in their briefing.

The Court will resolve this dispute as it did Plaintiffs' similar challenge to Mr. Green's alleged lack of methodology. Dr. Wind may opine regarding the importance of brand strength in the pharmaceutical industry based on his undisputedly extensive marketing experience. The Court finds that experience provides sufficiently "good grounds" to justify Dr. Wind's opinion on this point. Defendant may then cross-examine him as appropriate.

### iii.    Key Finding 3

The court next examines Dr. Wind's conclusion that "Defendant's internal documents show that it "intentionally rebranded itself as 'Merck' to capitalize on [Plaintiffs'] reputation and

thus enhance its U.S. positioning and brand equity" ("Key Finding 3") (Wind Report ¶ 3). Defendant argues that merely summarizing Defendant's internal emails and documents and then opining about what intent can be inferred from those, "without any additional analysis or methodology applied, is not the proper role of an expert and usurps the jury's fact-finding function." (Wind Mov. Br. at 4–5). Defendant further contends that Dr. Wind's opinion must be based on "good grounds," i.e., science methods and procedures rather than subjective beliefs or unsupported speculation, (id. at 5–6), and that Dr. Wind failed to consider other documents that undermined his conclusion, (id. at 6). Plaintiffs contend that Dr. Wind's analysis of Defendant's internal documents would be helpful to the jury because he did not simply read them but rather "analyze[d] and interpret[ed] those complex technical documents and put[] them into context" as a branding and marketing expert with years of experience. (Wind Opp. Br. at 5). Further, Plaintiffs assert that Dr. Wind's opinion that Defendant's use of the "Merck" brand is *intentional* "is not the type of 'motivation' or 'state of mind' testimony that courts have excluded, but rather [is] admissible expert testimony 'about what he believed [the company was] prepared to do' and did so." (*Id.* at 6 (alterations in original) (citing cases)).

For the same reasons the Court articulated when addressing Defendant's motion to exclude Mr. Parry's opinions, it will *not* permit Dr. Wind to testify as to Defendant's subjective intent or state of mind (either generally or as reflected in specific documents). The Court will, therefore, grant Defendant's motion to the extent it seeks to preclude Dr. Wind from testifying about Key Finding 3.

### iv.        Key Finding 4

The Court next examines Dr. Wind's conclusion that Defendant "executed on its plan to rebrand itself in the U.S. as 'Merck KGaA, Darmstadt, Germany'" ("Key Finding 4") (Wind

Case 2:16-cv-00266-ES-MAH    Document 302 *SEALED*    Filed 11/12/25    Page 54 of 60 PageID: 13629

Report ¶ 3). Specifically, Defendant challenges that conclusion to the extent Dr. Wind opined that Defendant "is using the 'Merck KGaA, Darmstadt, Germany' name as a brand name and not a mere corporate name or firm name." (Wind. Mov. Br. at 7 (citing Wind Report ¶ 70)). Defendant argues that Dr. Wind did not provide any methodology or analysis to support this opinion but rather "display[ed] screenshots of what he considers 'brand' websites of companies like Ford, Pfizer, and other household names and state[d] that, in his subjective opinion, Defendant's use of 'Merck KGaA, Darmstadt, Germany' on its corporate website looks similar." (Wind Mov. Br. at 7). Defendant also contends that Dr. Wind did not conduct or cite to any studies regarding relevant consumers' perceptions to support his subjective belief. (*Id.*).

Plaintiffs, on the other hand, argue that Dr. Wind based his opinion on his extensive experience with "corporate marketing and branding projects," as well as his review of certain of Defendant's "public facing materials." (Wind Opp. Br. at 12 (quoting Dr. Wind Report ¶¶ 69–70)). Plaintiffs assert that Dr. Wind's decades of relevant experience provide "good grounds" for his opinion on this subject. The Court agrees. As it found above regarding Dr. Green and Dr. Wind's Key Finding 2, Dr. Wind's extensive, relevant experience provides the "good grounds" necessary to ensure that his Key Finding 4 is sufficiently reliable to survive exclusion.

### v.    Key Finding 5

For his next finding, Dr. Wind wrote: "Analyzing the posts of individuals, organizations, and news aggregators on social networks before versus after [Defendant's] rebranding efforts shows initial evidence that the rebranding has led to a significantly higher level of potential confusion, i.e., in third parties' use of 'Merck' to describe [Defendant's] products, activities, and events" ("Key Finding 5"). (Wind Report ¶ 3). Defendant notes that "Dr. Wind commissioned a third party, Voluble, to tabulate the number of social media posts [that] supposedly reflect[ed] 'confusion' before and after June 2015." (Wind Mov. Br. at 8). Voluble did so using "data

collected by another third party, Crimson Hexagon." (*Id.*). Crimson Hexagon collected that underlying data "pursuant to that [its] undisclosed, proprietary methods." (*Id.*).

Defendant argues that the Court should exclude Key Finding 5 on five grounds: (i) Dr. Wind incorrectly defined consumer "confusion" as "[w]hether third parties use the term 'Merck' to describe '[Defendant's] products, activities, and events[,]" which fatally flaws his social media study; (ii) Dr. Wind's conclusion that "confusion" increased after June 2015 is unsupported and "meaningless" because it does not address the total number of posts nor the proportion of potentially confused posts; (iii) Dr. Wind's underlying data is unreliable because it is unknown what methodology third party Crimson Hexagon used in compiling data; (iv) Dr. Wind biased the results of his social media study by selecting June 2015 as Defendant's "rebranding" date; and (v) Dr. Wind arbitrarily "excluded from his before-and-after analysis . . . posts relating to Sigma-Aldrich (a company Defendant acquired), the majority of which occurred in [the period prior to Defendant's rebranding campaign]" thereby skewing the results of his analysis. (*Id.* at 8–13).

In response, Plaintiffs argue that Dr. Wind's social media study is sufficiently reliable because he worked with a firm specializing in such studies (Voluble) to determine how frequently United States-based social media users confused Plaintiffs and Defendant both before and after Defendant's rebranding campaign. Specifically, Dr. Wind reviewed "a statistically significant sample of posts that mentioned [Plaintiffs] or [Defendant]" and identified as "potential confusion" any post that incorrectly attributed one of Defendant's products, activities, or events to Plaintiffs. (Dr. Wind Opp. Br. at 7; *see also id.* at 7–11). Referring generally to Defendant's attacks on the methodology Dr. Wind used for that study, Plaintiffs argue that those critiques, even if substantiated, go to the weight of the evidence rather than its admissibility. (*Id.* at 8). Regarding the substance of those critiques, Plaintiffs respond: (i) that "the law does not require showing that

a particular 'proportion' of customers are deceived"; (ii) that there is no reason Dr. Wind (and Defendant's own expert Dr. Steckel) cannot rely on third party Crimson Hexagon in forming their opinions; (iii) that Defendant fails to say how the June 2015 date skewed the study results, and, in any event, Dr. Wind explained the basis for his selecting the June 2015 date—and further, this is an issue for the jury to decide; and (iv) that Dr. Wind's choice to exclude certain posts about Sigma-Aldrich "to avoid any bias from this one-time surge in posts" is not a basis to exclude this opinion and instead is an issue of weight, and that even if those posts had been included, Dr. Wind's study still would have shown "that there were 3.5 times more potentially confused posts after the rebrand than before." (*Id.* at 9–11).

Parsing Defendant's various arguments regarding Dr. Wind's social media study, the Court finds that they fit into two buckets. First, Defendant argues that, because the study depends on data (i.e. social media posts) that third-party Crimson Hexagon collected, and Dr. Wind is not familiar with how Crimson Hexagon completed that collection, any opinion based on that data is unreliable. (Wind Mov. Br. at 9–10). The Court disagrees for the same reasons that it articulated above with regard to the brand ranking data Dr. Wind used to support his Key Finding 1. The record reflects that Crimson Hexagon is "a leading media data provider with one of the most comprehensive databases [of social media posts] in the industry." (D.E. No. 284-1 at 4 (ECF pagination)). Defendant does not suggest otherwise. Indeed, Defendant's expert, Dr. Steckel, testified that he also "depended" on Crimson Hexagon in his work and that he "trust[ed]" that data source. (D.E. No. 283–1 at 341:3–16). Nothing in the record gives the Court any reason to believe that issues with the Crimson Hexagon's data might render Dr. Wind's Key Finding 5 unreliable.

The second bucket contains various specific attacks on Dr. Wind's methodology for his social media study. As it found with regard to Defendant's miscellaneous challenges to Dr.

Hanssens's methodology, the Court does not find that these issues, whether taken individually or collectively, render Dr. Wind's social media study so "fatally flawed to be inadmissible as a matter of law. Defendant can seek to highlight its shortcomings on cross-examination." *Gutierrez*, 2006 WL 3246605 at *6. The Court will therefore deny Defendant's motion to the extent it seeks exclusion of Key Finding 5.

### vi.        Key Finding 6

Defendant also takes issue with Dr. Wind's opinion that "[e]vidence from a variety of sources including consumer contacts with [Plaintiffs] and [Defendant] as well as from media reports show actual confusion between [Plaintiffs] and [Defendant]." ("Key Finding 6"). (Wind Report ¶ 3). Defendant argues that this "opinion merely summarizes a small handful of examples of newspaper stories and call logs in which third parties appear to be referring to Plaintiffs when they mean to refer to Defendant, or vice versa." (Wind Mov. Br. at 13). Defendant contends that merely summarizing documents is not proper expert testimony and, moreover, that Dr. Wind is has not established that Defendant's actions caused—or even had an impact on—any such confusion. (*Id.*). Plaintiffs argue that, far from simply "summarizing" examples, Dr. Wind analyzed them using his expertise. (Wind Opp. Br. at 14). Plaintiffs also point out that these examples are just one piece of the puzzle that Dr. Wind considered when reaching his determination on consumer confusion. (*Id.*).

Plaintiffs have the better argument here. First, rather than simply parroting information contained in call logs, articles, and other documents, Dr. Wind interpreted those materials and drew conclusions based upon his expertise. Second, regarding Defendant's contention that Dr. Wind has not established a causal link between Defendant's actions and these examples of confusion, the Court notes that the relevant "key finding" at issue is simply that there *was* confusion. Whether Plaintiffs ultimately tie those examples of confusion to Defendant's actions

is a separate question. Defendant may certainly inquire about the proof of any causal link during cross-examination. The Court will not, however, preemptively exclude Dr. Wind's testimony regarding Key Finding 6.

### vii.    Key Finding 7

Finally, the Court examines Dr. Wind's conclusion that "[n]egative publicity about [Defendant] is likely to be incorrectly attributed to Merck and thus impact negatively its brand image and equity." ("Key Finding 7"). (Wind Report ¶ 3). Defendant argues that "[i]nstead of providing any actual analysis to support his opinion, Dr. Wind again merely cites to a handful of news articles purportedly reporting on negative press about Defendant, while referring to Plaintiff." (Wind Mov. Br. at 14–15). Defendant further argues that there is no causal link between the Defendant's actions and the alleged confusion, and no indication that the confusion caused any harm. (*Id.* at 15). In sum, Defendant contends that "Dr. Wind's recitation of a few examples, unaccompanied by any reliable methodology or analysis to support his conclusions, is not proper expert testimony." (*Id.*). In response, Plaintiffs argue that Dr. Wind "reviewed actual evidence of confusion—where negative publicity about [Defendant] was incorrectly attributed to [Plaintiff]— and opined why that is and how it harms Merck." (Wind Opp. Br. at 14).

Again, the Court finds that Dr. Wind's opinion on this subject is based on sufficient "good grounds" to ensure its reliability. Dr. Wind brought his unquestioned marketing expertise to bear when analyzing the materials in question—several post-rebranding articles confusing the parties— and opining on why he believed those instances harmed Plaintiff. (Wind Report ¶¶ 131–134). His opinion is, therefore, sufficiently reliable to survive exclusion. Defendant may cross-examine him on any perceived deficiencies.

58

###### viii.    Summary of Rulings Regarding Dr. Wind

For the reasons described above, Defendant's motion to exclude Dr. Wind's testimony is **GRANTED-IN-PART** and **DENIED-IN-PART**. Specifically, the motion is **GRANTED** to the extent Defendant seeks to preclude Dr. Wind from simply parroting documents that the jurors can read for themselves. The motion is likewise **GRANTED** to the extent Dr. Wind would opine on Defendant's subjective intent—either generally or as set forth in a document (i.e. Key Finding 3). Defendant's motion is otherwise **DENIED**.[9]

## IV.    CONCLUSION

Based on the foregoing, the Court resolves the parties' motions in limine as follows:

- Defendant's Motion to Exclude Certain Opinions & Testimony of Plaintiffs' Expert Dominique M. Hanssens, (D.E. No. 261), is **DENIED**.

- Plaintiffs' Motion to Exclude Overseas Trademark Use & Foreign Litigations, i.e., to preclude Defendant from presenting any evidence, argument, or reference to overseas trademark use & foreign litigations, pursuant to Federal Rules of Evidence 401, 402, & 403, (D.E. No. 262), is **GRANTED-IN-PART and DENIED-IN-PART**. Plaintiffs' motion is granted to the extent that they seek to exclude any evidence of foreign litigation from presentation to the jury. Plaintiffs' motion is otherwise **DENIED** *without prejudice*.

- Plaintiffs' Motion to Exclude Testimony of Defendant's Expert Mr. Philip Green, pursuant to Federal Rules of Evidence 401, 402, & 702, (D.E. No. 264), is **DENIED**.

- Defendant's Motion to exclude the opinions and testimony of Plaintiffs' healthcare branding rebuttal expert Vince Parry, pursuant to Federal Rule of Evidence 702, (D.E. No. 268), is **GRANTED-IN-PART** and **DENIED-IN-PART**. Specifically, the motion is **GRANTED** to the extent Defendant seeks to preclude Mr. Parry from offering any opinions regarding Defendant's subjective intent or state of mind—either generally or with regard to particular communications or other documents. The motion is likewise **GRANTED** to the extent Defendant seeks to preclude Mr. Parry from simply parroting documents that the jurors can read for themselves. Defendant's motion is otherwise **DENIED**.

---

[9]    The Court notes that Defendant has also challenged the methodology underlying Dr. Wind's theory of "convergence validity." (D.E. No. 287 at 2). During oral argument, Plaintiffs represented that they will not seek to present testimony on convergence validity to the jury. (OA Tr. at 177: 22–25). The Court will not, therefore, consider it further herein.

59

- Plaintiffs' Motion to partially exclude certain opinions and testimony of Defendant's marketing rebuttal expert Dr. Joel Steckel, pursuant to Federal Rule of Evidence 702, (D.E. No. 269), is **GRANTED**.

- Defendant's Motion to exclude the opinions and testimony of Plaintiffs' marketing and branding expert Dr. Yoram "Jerry" Wind, pursuant to Federal Rule of Evidence 702, (D.E. No. 271), is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Specifically, the motion is **GRANTED** to the extent Defendant seeks to preclude Dr. Wind from simply parroting documents that the jurors can read for themselves.  The motion is likewise **GRANTED** to the extent Dr. Wind would opine on Defendant's subjective intent—either generally or with regard to particular communications or other documents (i.e. Key Finding 3).  Defendant's motion is otherwise **DENIED**.

An appropriate Order follows.


Dated:  November 12, 2025


s/ Esther Salas_____
**Esther Salas, U.S.D.J.**